## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIJAYA GOPU and NIRMALA GOPU, Individually And On Behalf of All Others Similarly Situated, <br> Plaintiff, <br><br> vs. <br><br> LUCKIN COFFEE INC., CHARLES ZHENGYAO LU, JENNY ZHIYA QIAN, JIAN LIU, REINOUT HENDRIK SCHAKEL, HUI LI, JINYI GUO, ERHAI LIU, SEAN SHAO, THOMAS P. MEIER, NEEDHAM & COMPANY, LLC, MORGAN STANLEY & CO. LLC, CHINA INTERNATIONAL CAPITAL CORP. HONG KONG SECURITIES LTD., HAITONG INT'L SECURITIES CO. LTD., CREDIT SUISSE SECURITIES (USA) LLC, and KEYBANC CAPITAL MARKETS INC., <br><br> Defendants. | CIVIL ACTION NO. 1:20-CV-1747 <br><br> CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS <br><br> JURY TRIAL DEMANDED |

## INTRODUCTION

This is a federal class action on behalf of purchasers of the publicly traded securities of Luckin Coffee Inc. ("Luckin" or the "Company") between **May 17, 2019 and April 6, 2020**, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"); including those who purchased American Depositary Receipt Shares ("ADS") in connection with or traceable to the Company's Initial Public Offering on or about May 17, 2019 (the "IPO"), or in connection with Luckin's public Secondary Offering on or about January 10, 2020 (the "Secondary Offering"); and including those who purchased Senior Convertible Notes in connection with the $400 million Note Offering conducted concurrently with the Secondary Offering, and seeking to pursue remedies under the Securities Act of 1933

(the "Securities Act"). As alleged herein, in addition to issuing negligently prepared and materially false and misleading Registration Statements and Prospectuses in connection with the May 2019 IPO and January 2020 Secondary Offering, during the Class Period, Defendants also published a series of materially false and misleading statements that Defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make Defendants' statements, in light of such material omissions, not materially false and misleading.

## OVERVIEW

1.      Founded in 2017 and based in Xiamen, the People's Republic of China, according to the Company's profile, Luckin purports to engage in the retail sale of freshly brewed drinks, including freshly brewed coffee and non-coffee drinks; and food and beverage items, such as light meals. The Company operates Pick-Up stores, Relax stores, and Delivery kitchens under the Luckin brand, as well as Luckin mobile app throughout the People's Republic of China. As of March 31, 2019, the Company reportedly operated 2,370 stores; including 2,163 Pick-Up stores, 109 Relax stores, and 98 Delivery kitchens, in 28 cities.

2.      In the Company's press releases, Luckin consistently and repeatedly described itself as having "pioneered a technology-driven new retail model to provide coffee and other products of high quality, high affordability, and high convenience to the customers. Empowered by big data analytics, AI, and proprietary technologies." Thus, in addition to providing coffee and tea, at all relevant times, Defendants promoted their purported expertise in managing and reacting to information, data management, and purportedly using that data to manage and test revenue and expense models, and to assure accurate and complete reporting, and transparency.

3.      According to Defendants, by the inception of the Class Period and at the time of Luckin's May 2019 IPO, the Company had purportedly grown at a very rapid pace –expanding exponentially since its founding. Moreover, while Defendants reported that Luckin had previously experienced certain operational and control weaknesses, by the inception of the Class Period Defendants reported that such deficiencies had been mediated, such that it was reasonable to rely on the Company's reported results of operations and its forecasts and guidance. Thus, by the inception of the Class Period and at the time of the May 2019 IPO, Defendants consistently stated that the Company had managed its rapid growth through the development of adequate controls and procedures – including controls over financial reporting and revenue recognition procedures and policies.

4.      Moreover, at the time of the May 2019 IPO and the January 2020 Secondary Offering, and throughout the Class Period, Defendants consistently claimed that Luckin maintained cutting-edge proprietary marketing, artificial-intelligence, and management tools that allowed Defendants to collect and manage information about the Company, in real time. Defendants' statements regarding their ability to collect and review financial and operational information about Luckin was critical to investors because these tools were supposed to allow the Company to consistently review and test its accounting assumptions and, when necessary, make adjustments thereto. Throughout the Class Period, Defendants repeatedly stated that Luckin had *already* made all necessary adjustments to the Company's financial statements and balance sheet, and that Luckin's revenues and products sold were periodically reviewed and adjusted, such that reports related thereto had already been determined to be accurate and sufficient.

5.      At all times during the Class Period, Defendants consistently stated they had been able to develop adequate controls and procedures to manage such growth while at the same time, being on a path to profitability. Defendants' representations that Luckin was on the verge of and had ultimately reached profitability at the store-level was critically important to investors, and such statements had a material impact on the market and caused a huge increase in the price of the Company's shares – including a more than 100% increase in the price of Luckin ADS shares on the NASDAQ during the short period from early-November 2019 to mid-January 2020. Throughout the Class Period, Luckin described itself as one of the fastest growing coffee companies in the People's Republic of China.

6.      As purported evidence of the foregoing, at the time of the Company's May 2019 IPO and thereafter throughout the remainder of the Class Period, including at the time of Luckin's January 2020 Secondary Offering and the Concurrent $400 million Note Offering, Defendants repeatedly stated that Luckin was achieving record setting revenue growth, and that the Company stores were operating profitably after quarters of reported losses. According to Defendants, these strong financial results were the product of Defendants' management skills and abilities and the controls and procedures that were purported to exist at the Company at that time and throughout the Class Period – and they were expected to continue in the foreseeable near-term so as to allow Luckin to achieve guidance sponsored and/or endorsed by Defendants.

7.      The representations concerning the Company's systems and controls and Defendants' statements concerning Luckin's financial condition and GAAP compliance were either patently untrue, or the Company's proprietary real-time information management systems were providing Defendants with information, throughout the Class Period, that they knew or recklessly disregarded was in stark contrast to their positive statements concerning the

4

Company's strength and profitability. Unbeknownst to investors, in truth and in fact, throughout the Class Period, Luckin was suffering from a host of undisclosed adverse factors which were negatively impacting its business and that would foreseeably cause it to report declining financial results – materially less than the market expectations Defendants had caused and cultivated.

8.     In particular, at the time of both the May 2019 IPO and the January 2020 Secondary Offering and concurrent Convertible Note Offering, and thereafter at all times during the Class Period, Defendants knew and/or failed to disclose, *inter alia*, that:

- It was not true that the Company's purported success was the result of management's ability to manage rapid growth and expansion when, in fact, throughout the Class Period, Defendants had artificially inflated the Company's net revenues by as much as 40% or US$310 million by engaging in fraudulent financial reporting and fraud.

- It was not true that Defendants had mediated past control and reporting deficiencies such that it was reasonable for investors to buy ADS shares of the Company, or such that the risk disclosures reported by Luckin warned of the true risks involved in investing in Luckin at that time.

- Defendants had presented a financial statement and balance sheet that each materially overstated the Company's profitability by under-reporting the costs necessary to install within the Company the necessary systems of internal financial and operational control, and control over financial reporting, and by failing to make proper, timely adjustments to the Company's operational and financial reports.

- It was also not true that Luckin maintained adequate systems of internal operational or financial controls, such that Luckin's reported financial statements were not true, accurate or reliable.

- As a result of the foregoing, it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP ad SEC rules.

- As a result of the aforementioned adverse conditions that Defendants failed to disclose, throughout the Class Period, Defendants lacked any reasonable basis to claim the Company was operating according to Plan, or that Luckin could achieve Guidance sponsored and/or endorsed by Defendants.

9.     In addition to the foregoing, throughout the Class Period it was also materially false and misleading and was known to Defendants to be materially false at that time, or was

recklessly disregarded as such thereby, to make the specific representations identified *infra*, for the following reasons:

- As a result of Defendants' fraudulent business practices that had already begun by the time of the May 2019 IPO, it was not true that Luckin stores were approaching, nor had they surpassed, the critical break-even level.

- As a result of Defendants' fraudulent business practices that had already begun by the time of the May 2019 IPO, it was not true that Luckin had reported an almost 700% increase in revenues, when as much as 40% of those sales may have been fabricated.

- As a result of Defendants' fraudulent business practices (later identified by the Anonymous Report published in January 2020), Defendants had artificially inflated the customer count and number of products sold at a material number of locations and, accordingly, all statements regarding such metrics were also materially false and misleading and were known to be false or recklessly disregarded as such, thereby.

- As a result of the fraudulent accounting and lack of controls and procedures that existed at Luckin throughout the Class Period, it was materially false and misleading for Defendants Qain or Lu to represent that the Company's business was continuing to execute according to a long-term performance and operational growth plan.

- As a result of the material fabrication of revenues, Defendants had also overstated cash flows and understated the true cost of revenues and operating costs; accordingly, all statements regarding such metrics were also materially false and misleading and were known to be false or recklessly disregarded as such, thereby.

- As a result of the fraudulent artificial inflation of revenues and under-reporting of costs and expenses, the graphic representations made by Defendants during the Company's 2Q:19 and 3Q:19 Presentations for analyst and investors, as demonstrated in part herein, *infra*, were each materially false and misleading and were known to be false or recklessly disregarded as such, thereby.

10.     After taking pains to deny and refute charges of fraud and accounting manipulation in early-February 2020, the truth about Luckin began to emerge on April 2, 2020 – only days after two new Independent Board members joined the Luckin Board and Audit Committee – at which time Defendants belatedly disclosed that Chief Operating Officer,

6

Defendant Jian Liu, and other employees of the Company, had engaged in a scheme and illegal course of conduct to artificially inflate revenues, such that revenues had been inflated by as much as US$310 million during 2019, and were falsely reported from the inception of 2Q:19, that period commenced April 1, 2019 – at least 6 weeks prior to the May 17, 2019 IPO.

11.     At that time, investors first learned that Defendant Jian Liu had been removed from the Company and that Luckin was operating well below analysts' expectations, and that the Company would likely report a massive loss for the fourth quarter of 2019 to account for as much as $310 million in fraudulent revenue. At that time, investors also learned that the Company could not achieve the guidance for full year 2019 or 2020 previously sponsored and/or endorsed by Defendants, after Defendants withdrew prior Guidance and did not provide investors with revised projections.

12.     Based on the huge disparity between Defendants' prior guidance, the Company's past performance, and the adjustment to results announced by Defendants, on April 2, 2020 Luckin's ADS shares imploded – falling over 80% in the single trading day, from the prior day's close of $26.20 per share to a new 52-week low of $6.40, and then to a close at $5.38 the following trading day – well below the Class Period high of $51.38 per ADS share, on January 17, 2020.

13.     Then, on April 6, 2020, Goldman Sachs & Co. LLC ("Goldman Sachs") announced that an entity controlled by Defendant Lu had defaulted on a $518 million margin loan facility and a group of lenders was putting 76.3 million of the Company's ADS—pledged as collateral for the loan by Defendants Lu and Zhiya—up for sale, with Goldman Sachs acting as the "disposal agent." In other words, Goldman's announcement revealed that while the Company's shares were artificially inflated by and through Defendants' misrepresentations,

Defendants Lu and Zhiya cashed out over 76 million shares to act as collateral for *personal* loans. This revelation eroded even more of the artificial inflation from the value of Luckin's ADS shares, taking them to their lowest-ever price of $4.39 per share at close on April 6, 2013.

14.     During the same period in which Luckin's share price fell over 80% as a result of Defendants' illegal and improper course of conduct and their fraud being revealed, the NASDAQ Index remained relatively unchanged. The economic loss (*i.e.* damages suffered by plaintiff and other members of the Class), is a direct result of Defendants' fraudulent scheme to artificially inflate the price of Luckin's ADS shares, and the subsequent significant decline in the value of the Company's shares when Defendants' prior misstatements and other fraudulent conduct was revealed, is evidenced by the Chart below:



15.     Defendants were motivated to and actually did conceal the true operational and financial condition of Luckin and materially misrepresented and failed to disclose the conditions that were *already* adversely affecting Luckin at the time of the May 2019 IPO, the January 2020 Secondary Offering, and throughout the Class Period. Defendants' scheme: (i) deceived the investing public regarding Luckin's business, operations, management and the intrinsic value of

Luckin ADS shares; (ii) enabled Defendants to register for sale with the SEC over US$645.15 million of Company ADSs in connection with the Initial Public Offering; (iii) enabled Defendants to register for sale with the SEC an additional US$666.54 million of Company ADSs in connection with the Secondary Offering; (iv) enabled Defendants to also sell US$460 million in Senior Convertible Notes (convertible into shares of the Company at $52.00 – a 30% premium over the ADS Secondary Offering share price of US$42.00) concurrently with the Secondary Offering; (v) enabled Luckin insiders to sell US$231.84 million of their privately held Luckin shares while in possession of material adverse non-public information about the Company; and (vi) caused Plaintiffs and other members of the Class to purchase Luckin ADS shares at artificially inflated prices.

## JURISDICTION AND VENUE

16.     Jurisdiction is conferred by §22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77v, and §27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa and 28 U.S.C. §1331. The claims asserted herein arise under §§11, 12(a)(2) and 15 of the Securities Act, §§77k and 77o, and rules promulgated thereunder by the Securities and Exchange Commission (the "SEC"), and **§§**10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

17.     Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. §1391(b), §1337 and §27 [15 U.S.C. §78aa]. Defendant Luckin is a foreign or "alien" corporation that does significant business in this District, and may properly be sued in any District of the United States, including the Eastern District of New York.

18.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

19.     Plaintiffs **VIJAYA GOPU** and **NIRMALA GOPU**, as set forth in the accompanying certification, incorporated by reference herein, purchased Luckin ADSs at artificially inflated prices during the Class Period and has been damaged thereby.

**Corporate & Individual Defendants**

20.     Defendant **LUCKIN COFFEE INC.** is a corporation founded in 2017 and organized under the laws of the Cayman Islands with its principal place of business in Xiamen, China, located at Block A, Tefang Portman Tower-17th Floor, No.81 Zhanhong Road, Siming District, 361008. According to the Company's profile, Luckin purports to engage in the retail sale of freshly brewed drinks, and pre-made food and beverage items in the People's Republic of China, offering freshly brewed drinks, including freshly brewed coffee and non-coffee drinks; and food and beverage items, such as light meals. The Company operates pick-up stores, relax stores, and delivery kitchens under the Luckin brand, as well as Luckin mobile app. As of March 31, 2019, the Company purported to operate 2,370 stores, including 2,163 pick-up stores, 109 relax stores, and 98 delivery kitchens, in 28 cities.

21.     **Corporate Structure.** Luckin incorporated its current ultimate holding company in June 2017, and commenced operations in October 2017. The following chart shows the Company's corporate structure as of the date of the May 2019 IPO, including principal subsidiaries and variable interest entities, as follows:



22.     Defendant **CHARLES ZHENGYAO LU** ("Lu") was, during the relevant period, Chairman of the Board of Directors and has been identified as a Co-Founder of the Company. During the relevant period, including the Class Period, Defendant Lu signed the Company's SEC filings, including the materially false and misleading Registration Statement and Prospectus issued in connection with the IPO and Secondary Offering of ADSs by the Company and certain "Selling Shareholders" (as defined herein *infra*). At the time of the IPO, Defendant Lu held approximately 25% of the common stock of the Company, which shares were worth over US$3 billion during the Class Period at the height of the artificial inflation of Luckin's shares.[1]

---

[1] Defendant Lu also founded CAR Inc. in 2007, serving as Executive Director, Chairman of the Board, and Chief Executive Officer for CAR Inc. from 2014 to 2016, and is currently a non-Executive Director and the Chairman of the Board of CAR Inc. Defendant Lu is also the Chairman of the Board and Chief Executive Officer for UCAR Inc., a substantial shareholder of CAR Inc. Defendant Jenny Zhiya Qian served as a director and the Chief Operating Officer for UCAR Inc. from 2016 to 2017, and served as an Executive Vice-President and Chief Operating Officer for CAR Inc. from 2014 to 2016. Defendant Jian Liu served as the Chief of Yield Management for UCAR Inc. from 2015 to 2018. From 2008 to 2015, Defendant Jian Liu served successively as the Deputy Head of Vehicle Management Center and the Head of Yield Management for CAR Inc. Defendant Jinyi Guo served as the Assistant to the Chairman for UCAR Inc., Defendant Lu, from 2016 to 2017.

23.     Defendant **JENNY ZHIYA QIAN** ("Qian") was, during the relevant period, Chief Executive Officer and a member of the Board of Directors of the Company, and has been identified as a Co-Founder of Luckin. During the relevant period, including the Class Period, Defendant Qian signed the Company's SEC filings, including the materially false and misleading Registration Statement and Prospectus issued in connection with the IPO and Secondary Offering of ADSs by the Company and certain "Selling Shareholders" (as defined herein *infra*). At the time of the IPO, Defendant Qian held approximately 16.5% of the common stock of the Company, which shares were worth almost US$2 billion during the Class Period at the height of the artificial inflation of Luckin's shares.

24.     Defendant **JIAN LIU** ("J. Liu") was, during the relevant period, Chief Operating Officer, since May 2018, and a member of the Board of Directors of the Company since February 2019. During the relevant period, including the Class Period, Defendant J. Liu signed the Company's SEC filings, including the materially false and misleading Registration Statement and Prospectus issued in connection with the IPO and Secondary Offering of ADSs by the Company and certain "Selling Shareholders" (as defined herein *infra*). At the time of the IPO, Defendant J. Liu was reported to hold no equity in the Company.

25.     Defendant **JINYI GUO** ("Guo") was, during the relevant period, Senior Vice President in charge of Product & Supply Chain, since October 2017, and a member of the Board of Directors of the Company since June 2018. During the relevant period, including the Class Period, Defendant Guo signed the Company's SEC filings, including the materially false and misleading Registration Statement and Prospectus issued in connection with the IPO and Secondary Offering of ADSs by the Company and certain "Selling Shareholders" (as defined

herein *infra*). At the time of the IPO, Defendant Guo was reported to hold no equity in the Company.

26.     Defendant **HUI LI** ("Li") was, during the relevant period, a member of the Board of Directors of the Company, since June 2018. During the relevant period, including the Class Period, Defendant Li signed the Company's SEC filings, including the materially false and misleading Registration Statement and Prospectus issued in connection with the IPO and Secondary Offering of ADSs by the Company and certain "Selling Shareholders" (as defined herein *infra*). At the time of the IPO, Defendant Li held approximately 10% of the common stock of the Company, which shares were worth over US$1.2 billion during the Class Period at the height of the artificial inflation of Luckin's shares. In connection with the Secondary Offering, Defendant Li, in coordination with Centurium Capital (of which he is founder and Chief Executive Officer), the Selling Shareholders, sold 38.4 million shares of the Company, equal to 4.8 million ADS shares priced at $42.00 per share on January 10, 2020, for gross proceeds of US$201.6 million.[2]

27.     Defendant **ERHAI LIU** ("E. Liu") was, during the relevant period, a member of the Board of Directors of the Company, since November 2018. During the relevant period, including the Class Period, Defendant E. Liu signed the Company's SEC filings, including the materially false and misleading Registration Statement and Prospectus issued in connection with the IPO and Secondary Offering of ADSs by the Company and certain "Selling Shareholders"

---

[2] Defendant Li has also been a director of China Biologic Products, Inc. since 2013 and served as the Chairman of the Board of the company from 2018 to February 2019. Defendant Li also worked in the investment banking division of Goldman Sachs from 2001 to 2002 and Morgan Stanley from 1994 to 2001. Defendant Sean Shao, identified as one of two Independent Directors of Luckin, has also served as a director of China Biologic Products, Inc. since 2008, and presumably was instrumental in appointing defendant Li to the board and making him chairman thereof.

(as defined herein *infra*). At the time of the IPO, Defendant E. Liu was identified as a member of the Audit Committee of the Board of Directors of the Company. At the time of the IPO, Defendant E. Liu held approximately 5% of the common stock of the Company, which shares were worth over US$600 million during the Class Period at the height of the artificial inflation of Luckin's shares.

28.     Defendant **REINOUT HENDRIK SCHAKEL** ("Schakel") was, during the relevant period, Chief Financial Officer and Chief Strategy Officer, since January 2019. During the relevant period, including the Class Period, Defendant Schakel also worked at the corporate and institutional banking division of Standard Chartered Bank as an executive director from 2016 to 2018, and from 2008 to 2016, Defendant Schakel served successively as an analyst, associate, and vice president for the investment banking division of Credit Suisse. At the time of the IPO, Defendant Schakel was reported to hold no equity in the Company.

29.     Defendant **SEAN SHAO** ("Shao") is purported to be one of two Independent Directors on the board of the Company, since May 2019. While Defendant Shao did not sign the Form F-1 Registration Statement issued in connection with the IPO, on April 18, 2019, Defendant Show signed a Letter of Consent, filed as exhibit 99.4 of the Registration Statement which stated that, "Pursuant to Rule 438 under the Securities Act of 1933, as amended, I hereby consent to the references to my name in the Registration Statement on Form F-1 (the "Registration Statement") of the Company and any amendments thereto, which indicate that I have accepted the nomination to become a director of the Company. I further agree that immediately upon the Securities and Exchange Commission's declaration of effectiveness of the

Registration Statement, I will serve as a member of the board of directors of the Company."[3] At the time of the IPO, Defendant Shao was identified as the Chair of the Audit Committee of the Board of Directors of the Company.[4] At the time of the IPO, Defendant Shao was reported to hold no equity in the Company.

30.     Defendant **THOMAS P. MEIER** ("Meier") is purported to be one of two Independent Directors on the Board of the Company, since May 2019. While Defendant Meier did not sign the Form F-1 Registration Statement issued in connection with the IPO, on April 18, 2019, Defendant Meier signed a Letter of Consent, filed as exhibit 99.5 of the Registration Statement which stated that, "Pursuant to Rule 438 under the Securities Act of 1933, as amended, I hereby consent to the references to my name in the Registration Statement on Form F-1 (the "Registration Statement") of the Company and any amendments thereto, which indicate

---

[3] In addition to Luckin, Defendant Shao also reported to have served as an independent director at the following companies, each of which has a history of being sued by investors for stock fraud, some companies more than once:

| | | |
|---|---|---|
| Jumei Int'l Holdings Ltd. (since 2014): | Sued 12/14 | Class Period: 5/15/14 - 11/20/14 |
| LightInTheBox Hldngs. Ltd. (since 2013): | Sued 8/13 | Class Period: 6/6/13 – 8/19/13 |
| Agria Corp. (2008 – 2017): | Sued 4/08; Sued 11/16 | Class Period: 11/6/07 – 6/26/08; Class Period: 6/8/16 – 11/4/16 |
| UTStarcom Holdings Corp. (since 2012): | Sued 3x between 10/01 and 9/07 | |

[4] The Audit Committee of the Luckin Board of Directors is responsible for the following: (i) reviewing with the independent registered public accounting firm any audit problems or difficulties and management's response; (ii) discussing with our independent auditor, among other things, the audits of the financial statements, including whether any material information should be disclosed, issues regarding accounting and auditing principles and practices; (iii) discussing the annual audited financial statements with management and the independent registered public accounting firm; (iv) reviewing the adequacy and effectiveness of our accounting and internal control policies and procedures and any special steps taken to monitor and control major financial risk exposures; and (v) approving annual audit plans, and undertaking an annual performance evaluation of the internal audit function.

that I have accepted the nomination to become a director of the Company. I further agree that immediately upon the Securities and Exchange Commission's declaration of effectiveness of the Registration Statement, I will serve as a member of the board of directors of the Company." At the time of the IPO, Defendant Meier was identified as a member of the Audit Committee of the Board of Directors of the Company. At the time of the IPO, Defendant Meier was reported to hold no equity in the Company.

31.     The Defendants referenced above in ¶¶21-30 are referred to herein as the "Individual Defendants."

**IPO Underwriter Defendants**

32.     Defendant **CREDIT SUISSE SECURITIES (USA) LLC** ("Credit Suisse") is a financial services company located in New York, New York. Credit Suisse served as an Underwriter for both the May 2019 IPO and the January 2020 Secondary Offering. As Underwriter, Defendant Credit Suisse assisted in the preparation and drafting of the Registration Statements and Prospectuses filed with the SEC in connection with the Offerings and first created a public market and then facilitated in making additional the public sales of Luckin ADS shares during the relevant period.

33.     Defendant **MORGAN STANLEY & CO. LLC** ("Morgan Stanley") is a financial services company located in New York, New York. Defendant Morgan Stanley served as an Underwriter for both the May 2019 IPO and the January 2020 Secondary Offering. As Underwriter, Defendant Morgan Stanley assisted in the preparation and drafting of the Registration Statements and Prospectuses filed with the SEC in connection with the Offerings and first created a public market and then facilitated in making additional the public sales of Luckin ADS shares during the relevant period.

34. Defendant **CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED** ("CICC") is a financial services company located in Beijing, China. Defendant CICC served as an Underwriter for both the May 2019 IPO and the January 2020 Secondary Offering. As Underwriter, Defendant CICC assisted in the preparation and drafting of the Registration Statements and Prospectuses filed with the SEC in connection with the Offerings and first created a public market and then facilitated in making additional the public sales of Luckin ADS shares during the relevant period.

35. Defendant **HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED** ("Haitong") is a financial services company located in New York, New York. Defendant Haitong served as an Underwriter for both the May 2019 IPO and the January 2020 Secondary Offering. As Underwriter, Defendant Haitong assisted in the preparation and drafting of the Registration Statements and Prospectuses filed with the SEC in connection with the Offerings and first created a public market and then facilitated in making additional the public sales of Luckin ADS shares during the relevant period.

36. Defendant **KEYBANC CAPITAL MARKETS INC.** ("KeyBanc") is a financial services company located in Cleveland, Ohio. Defendant KeyBank served as an Underwriter for both the May 2019 IPO and the January 2020 Secondary Offering. As Underwriter, Defendant KeyBank assisted in the preparation and drafting of the Registration Statements and Prospectuses filed with the SEC in connection with the Offerings and first created a public market and then facilitated in making additional the public sales of Luckin ADS shares during the relevant period.

37. Defendant **NEEDHAM & COMPANY, LLC** ("Needham") is a financial services company located in New York, New York. Defendant Needham served as an Underwriter for both the May 2019 IPO and the January 2020 Secondary Offering. As

Underwriter, Defendant Needham assisted in the preparation and drafting of the Registration Statements and Prospectuses filed with the SEC in connection with the Offerings and first created a public market and then facilitated in making additional the public sales of Luckin ADS shares during the relevant period.

38.     The Defendants referenced above in ¶¶ 32-37 are referred to herein as the "Underwriter Defendants."

39.     In connection with the May 2019 Initial Public Offering, the following investment banks acted as "Lead Underwriters" of the Offering - - distributing 33 million ADS shares of Luckin to investors and initiating the first public market for Luckin ADS. Not including another 4.95 million shares distributed upon exercise of the Underwriters' Oversubscription Option, the distribution of IPO shares awarded Underwriters occurred, as follows:

| Underwriter | Number of ADSs |
|---|---|
| Credit Suisse Securities (USA) LLC | 20,130,000 |
| Morgan Stanley & Co. LLC | 4,950,000 |
| China International Capital Corporation Hong Kong Securities Limited | 3,300,000 |
| Haitong International Securities Company Limited | 3,300,000 |
| KeyBanc Capital Markets Inc. | 742,500 |
| Needham & Company, LLC | 577,500 |
| Total | 33,000,000 |

40.     In connection with the May 2019 Initial Public Offering, the Underwriter Defendants were paid over US$ 35.483 million in fees – or approximately 5.5% of the gross proceeds of the IPO, indirectly paid by purchasers of the Company's shares. The Underwriter Defendants were paid at least $0.935 per share in connection with the sale of the 37.95 million shares, including shares sold pursuant to the exercise of the Underwriter's Option.

18

**Secondary Offering Underwriter Defendants**

41.     In connection with the January 2020 Secondary Offering, the following investment banks acted as "Lead Underwriters" of the Offering - - distributing 13.8 million ADS shares of Luckin to investors. Not including another 2.07 million shares distributed upon exercise of the underwriters' over-subscription allotment option (720,000 by Selling Shareholders and 1.35 million ADS sold by Luckin), the distribution of Secondary Offering shares awarded Underwriters occurred, as follows:

| Underwriter | Number of ADSs |
|---|---|
| Credit Suisse Securities (USA) LLC | 8,280,000 |
| Morgan Stanley & Co. LLC | 1,725,000 |
| China International Capital Corporation Hong Kong Securities Limited | 1,725,000 |
| Haitong International Securities Company Limited | 1,380,000 |
| KeyBanc Capital Markets Inc. | 483,000 |
| Needham & Company, LLC | 207,000 |
| Total | 13,800,000 |

42.     In connection with the January 2020 Secondary Offering, the Underwriter Defendants were paid over US$23.3289 million in fees – or approximately 3.5% of the gross proceeds of the Secondary Offering, indirectly paid by purchasers of the Company's shares. The Underwriter Defendants were paid at least $1.47 per share in connection with the sale of the 15.87 million shares, including shares sold pursuant to the exercise of the Underwriter's Over-subscription Option.

43.     Shareholders were willing to, and did, pay these fees -- equal to as much as 5.5% of the gross sales price -- to compensate the Underwriter Defendants for conducting a purported significant due diligence investigation into Luckin. The Underwriter Defendants due diligence

investigation is a critical component of the initial public offering, and it was supposed to provide investors with important safeguards and protections.

44.     The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into Luckin's accounting and assumptions that extended well beyond a mere casual review of Luckin's accounting, financial report and operational and financial controls. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

45.     In addition to the foregoing, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they all had access to the adverse undisclosed information about Luckin's business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

46.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of Luckin, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day

operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Accordingly, the Individual Defendants were also involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

47.     As officers and controlling persons of a publicly-held company whose ADS shares was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq National Market Exchange (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded ADS shares would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

48.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Luckin, each

of the Individual Defendants had access to the adverse undisclosed information about Luckin's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Luckin and its business issued or adopted by the Company materially false and misleading.

49.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

50.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Luckin ADS shares by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Luckin's business, operations, management and the intrinsic value of Luckin ADS shares; (ii) enabled Defendants to register for sale with the SEC, over US$645.15 million of Company ADS in connection with the Initial Public Offering; (iii) enabled Defendants to register for sale with the SEC, an additional US$666.54 million of Company ADS in connection with the Secondary Offering; (iv) enabled Defendants to also sell US$460 million in Senior Convertible Notes (convertible into shares of the Company at $52.00) concurrently with the Secondary Offering; (v) enabled Luckin insiders to sell US$231.84 million of their privately held Luckin shares while in possession of material

adverse non-public information about the Company; and (v) caused Plaintiffs and other members of the Class to purchase Luckin ADS shares at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

51. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the ADS shares of Luckin between May 17, 2019 and April 2, 2020, inclusive (the "Class") and who were damaged thereby; including those who purchased shares in connection with the Company's May 2019 IPO and in its January 2020 Secondary Offering, or in connection with Defendants' sale of $400 million of Senior Convertible Notes, concurrently with the January 2020 Secondary Offering. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

52. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Luckin common shares were actively traded on the Nasdaq. As of the end of the Class Period in April 2020, the Company had over 53 million ADS shares issued and outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Luckin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Luckin; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a Class action.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Contained in
### the IPO Prospectus & Registration Statement

57.     On May 17, 2020, Luckin conducted its Initial Public Offering of 33 million ADS shares priced at $17.00 each. In addition, the Underwriters also received a 30-day option to purchase up to an additional 4.95 million ADS shares from the Company to cover over-allotments.[5] Gross proceeds from the sale of these ADS, including the oversubscription allotments, totaled over US$ 645.15 million. Shares of Luckin were listed and began trading that day on the NASDAQ under the symbol LK. On the first day of trading, Luckin shares opened trading at $25.00 per ADS before trading to an intra-day high of $25.96 and closing above $20.00 per share. That day, 38.9 million shares traded in a highly efficient market.

58.     The Luckin Initial Public Offering was made through an underwriting syndicate led by Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. LLC, China International Capital Corporation Hong Kong Securities Limited and Haitong International Securities Company Limited. In connection with the Initial Public Offering, Underwriters received proceeds of at least $35.84 million.

59.     In connection with the May 2019 Initial Public Offering, on April 22, 2019, Defendants filed with the Securities and Exchange Commission, pursuant to Form F-1, a Registration Statement in connection with the ultimate registration for sale of 37.95 million Luckin ADS shares. The initial Form F-1 did not list the number of shares expected to be sold. On May 6, 2019, however, the Company filed an Amendment to its Form F-1, pursuant to Form

---

[5] On June 19, 2019, Luckin announced the closing of the issuance of an additional 4,950,000 American Depositary Shares of the Company at the IPO price of US$17.00 per ADS, pursuant to the exercise in full of the Underwriters' Oversubscription Option in connection with the IPO.

F-1/A, which designated that 30 million shares would be registered in the IPO. Later, however, on May 17, 2019, Defendants also filed with the SEC, pursuant to Form 424(B)4, a copy of its Prospectus which registered for sale 33 million shares priced at $17 per share, in addition to 4.95 million shares granted as an Oversubscription Option to Underwriters. The Form 424(B)4 constituted part of the Form F-1 Registration Statement and the statements contained in both were the same or substantially similar.

60.     The April 22, 2019 Form F-1 Registration Statement was signed by Defendants Lu, Qian, J. Liu, Guo, Li, E. Liu and Schakel. While Defendants Shao and Meier did not sign the April 2019 Form F-1 Registration Statement, they each filed a Letter of Consent that was attached as an exhibit to the Registration Statement that consented to the references to their names in the Registration Statement on Form F-1 and any amendments thereto, which also indicated that each additional Defendant had accepted the nomination to become a director of the Company immediately upon the Securities and Exchange Commission's declaration of effectiveness of the Registration Statement.

61.     In addition to describing the terms and conditions of the Offering itself, the IPO Registration Statement and Prospectus contained statements that attested to the financial strength and well-being of the Company, as well as statements concerning Luckin's internal controls and procedures, management systems, and its accounting and auditing procedures and policies.

62.     The IPO Prospectus and Registration Statement represented to investors that the Company's financial statements and disclosures were made in accordance with Generally Accepted Accounting Principles and that the Company's consolidated financial statements contained all necessary adjustments. In this regard, the Proxy-Prospectus stated, in part, the following:

26

**Critical Accounting Policies**

We prepare our financial statements in accordance with U.S. GAAP, which requires our management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the balance sheet dates and revenues and expenses during the reporting periods. We continually evaluate these judgments and estimates based on our own historical experience, knowledge and assessment of current business and other conditions, our expectations regarding the future based on available information and assumptions that we believe to be reasonable, which together form our basis for making judgments about matters that are not readily apparent from other sources. Since the use of estimates is an integral component of the financial reporting process, our actual results could differ from those estimates. Some of our accounting policies require a higher degree of judgment than others in their application.

The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies and the sensitivity of reported results to changes in conditions and assumptions are factors that should be considered when reviewing our financial statements. We believe the following accounting policies involve the most significant judgments and estimates used in the preparation of our financial statements. You should read the following description of critical accounting policies, judgments and estimates in conjunction with our consolidated financial statements and other disclosures included in this prospectus.

63.     In addition to the general statements concerning the propriety of the Company's purported internal adjustments and GAAP compliance, the IPO Prospectus and Registration Statement also contained specific representations regarding Luckin's significant accounting policies and procedures, as follows:

**Summary of Significant Accounting Policies**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*(a) Basis of presentation*

The accompanying consolidated financial statements have been prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP").

*(b) Principles of consolidation*

The consolidated financial statements of the Group include the financial statements of the Company, its subsidiaries and the VIE for which the Company

27

is the primary beneficiary. All significant inter-company transactions and balances between the Company, its subsidiaries and the VIE have been eliminated upon consolidation.

*(c) Use of estimates*

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the balance sheet date and revenues and expenses during the reporting periods. Significant accounting estimates reflected in the Group's consolidated financial statements include, but not limited to, estimates for inventory reserves, useful lives and impairment of long-lived assets, accounting for deferred income taxes and uncertain tax benefits, valuation allowance for deferred tax assets, and valuations for the warrant liability, Angel Shares and convertible redeemable preferred shares. Changes in facts and circumstances may result in revised estimates. Actual results could differ from those estimates, and as such, differences may be material to the consolidated financial statements.

64.    In addition to the foregoing, regarding Revenue Recognition, the Registration

Statement and Prospectus stated, in part, the following:

(l) *Revenue recognition*

Customers place orders and pay for freshly brewed drinks and pre-made food and beverage items through the Group's self-developed app and Weixin mini-program with different options to pay through third party payment service providers. Revenues including delivery fees charged to customers are recognized at the point of delivery to customers. Revenues are reported net of VAT of 6% to 16% and discounts, if any. Customers that purchase prepaid vouchers are issued additional vouchers of the same value for free at the time of purchase. All vouchers are stored in the "Coffee Wallet" of the customers' registered accounts for future use. Cash received from the sales of prepaid vouchers are recognized as deferred revenues. Purchase consideration is equally allocated to each voucher as an element, including the vouchers issued for free, using the relative-selling-price method to determine an effective selling price for each voucher. The allocated effective selling price are recognized as revenues upon the redemption of the vouchers for purchases.

From time to time, for promotional purposes, the Group issues to customers discounts in the form of coupons that can be applied for future purchases. As the customers are required to make future purchases of freshly brewed drinks or pre-made food and beverage items when redeeming the coupons, the Group recognizes the amounts of discounts as reductions of revenues at the time of coupon redemption in accordance with ASC 605-50.

VAT and surcharges are recorded as reductions of revenues. VAT and surcharges amounted to RMB16 and RMB62,886 (US$9,370) for the period from June 16, 2017 (date of inception) through December 31, 2017 and for the year ended December 31, 2018, respectively.

65.     In the section of the Registration Statement and Prospectus headed, Internal Control over Financial Reporting, the Company disclosed that, in the past, it had discovered internal control deficiencies, but by the time of the IPO, Defendants stated that these weakness had been mediated and that investors could reasonably rely on managements' control over Luckin. As evidence of this, the Registration Statement stated, in part, the following:

Prior to this offering, we have been a private company with limited accounting and financial reporting personnel and other resources to address our internal controls and procedures. In connection with the audit of our consolidated financial statements as of and for the year ended December 31, 2018, we and our independent registered public accounting firm identified two material weaknesses in our internal control over financial reporting. As defined in the standards established by the Public Company Accounting Oversight Board of the United States, a "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

The material weaknesses identified are our company's lack of sufficient accounting and financial reporting personnel with requisite knowledge and experience in application of United States generally accepted accounting principles and Securities and Exchange Commission rules, and lack of financial reporting policies and procedures that are commensurate with U.S. GAAP and SEC reporting and compliance requirements.

We are in the process of implementing a number of measures to address these material weaknesses identified, including: (i) hiring additional accounting and financial reporting personnel with U.S. GAAP and SEC reporting experience, (ii) expanding the capabilities of existing accounting and financial reporting personnel through continuous training and education in the accounting and reporting requirements under U.S. GAAP, and SEC rules and regulations, (iii) developing, communicating and implementing an accounting policy manual for our accounting and financial reporting personnel for recurring transactions and period-end closing processes, and (iv) establishing effective monitoring and oversight controls for non-recurring and complex transactions to ensure the accuracy and completeness of our company's consolidated financial statements and related disclosures.

66.     In fact, at the time of the IPO, Defendants portrayed any control deficiency as a mere potential risk or contingency that might affect the Company at some unknown time in the future, rather than a continuing weakness that was continuing to plague Luckin and render it un-investable. As evidence of this, the related risk disclosure in the IPO Registration Statement stated, in part, the following:

> **If we fail to implement and maintain an effective system of internal controls to remediate our material weaknesses over financial reporting, we may be unable to accurately report our results of operations, meet our reporting obligations or prevent fraud, and investor confidence and the market price of the ADSs may be materially and adversely affected.**
>
> ***Prior to this offering***, we have been a private company with limited accounting and financial reporting personnel and other resources with which we address our internal control over financial reporting. In connection with the audit of our consolidated financial statements as of and for the year ended December 31, 2018, we and our independent registered public accounting firm identified two material weaknesses in our internal control over financial reporting. As defined in the standards established by the U.S. Public Company Accounting Oversight Board, or PCAOB, a "material weakness" is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.
>
> The material weaknesses identified are our company's lack of sufficient accounting and financial reporting personnel with requisite knowledge and experience in application of U.S. GAAP and the Securities and Exchange Commission, or the SEC, rules, and lack of financial reporting policies and procedures that are commensurate with U.S. GAAP and the SEC reporting requirements. ***We are in the process of implementing a number of measures to address the material weaknesses and deficiencies that have been identified***. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Internal Control Over Financial Reporting." However, ***<u>we cannot assure you that these measures may fully address the material weaknesses and deficiencies in our internal control over financial reporting or that we may conclude that they have been fully remediated.</u>***
>
> <p style="text-align:center">*        *        *</p>
>
> During the course of documenting and testing our internal control procedures, in order to satisfy the requirements of Section 404, we may identify other

weaknesses and deficiencies in our internal control over financial reporting. *If we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404*. Generally speaking, if we fail to achieve and maintain an effective internal control environment, it could result in material misstatements in *our financial statements and could also impair our ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis*. As a result, our businesses, financial condition, results of operations and prospects, as well as the trading price of the ADSs, *may be materially and adversely affected*. Additionally, ineffective internal control over financial reporting *could expose us to increased risk of fraud or misuse of corporate assets* and subject us to potential delisting from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions. We may also be required to restate our financial statements from prior periods.

67.    A significant amount of the IPO Registration Statement and Prospectus was dedicated to providing investors with purported Risk Disclosures, almost 40 pages of which filled the Prospectus. Many of these purported disclosures were generic in nature and applied equally as well to any company engaged in almost any business, as it did to Luckin, or they were generic in that they applied to almost any competitor of the Company. Where Luckin did provide Company-specific risk disclosures many were materially false because they presented as mere contingencies, actual problems and deficiencies that existed at the Company at the time of the Initial Public Offering in May 2019.

68.    For example, the Company stated that its limited operating history was another mere potential risk or contingency that could create future problems at Luckin, or that could have negative consequences for investors in the unknown future, in part, as follows:

**Our limited operating history may not be indicative of our future growth or financial results and we may not be able to sustain our historical growth rates.**

We commenced our operations in October 2017 and have achieved rapid growth since our inception. As of March 31, 2019, we operated 2,370 stores in 28 cities in China and had over 16.8 million cumulative transacting customers. However,

our limited operating history may not be indicative of our future growth or financial results. There is no assurance that we will be able to maintain our historical growth rates in future periods. Our growth rates may decline for any number of possible reasons and some of them are beyond our control, including decreasing customer spending, increasing competition, declining growth of China's coffee industry or China's food and beverage sector in general, emergence of alternative business models, or changes in government policies or general economic conditions. We will continue to expand our store network and product offerings to bring greater convenience to our customers and to increase our customer base and number of transactions. However, the execution of our expansion plan is subject to uncertainty and the total number of items sold and number of transacting customers may not grow at the rate we expect for the reasons stated above. If our growth rates decline, investors' perceptions of our business and prospects may be adversely affected and the market price of the ADSs could decline. In addition, since our business model is innovative in China's coffee industry, it increased the difficulty in evaluating our business and future prospects based on our historical operational or financial result.

69.     Thus, despite purportedly being on the verge of breaking even at the time of the IPO, the Company stated that it might continue to experience losses in the future, and this was a possible foreseeable risk that investors might continue to face. As evidence of this, the Registration Statement and Prospectus stated, in part, the following:

**We have incurred significant net losses since our inception and we may continue to experience significant net losses in the future.**

We have incurred significant net losses since our inception in June 2017. For the period from June 16, 2017 (inception date) to December 31, 2017, the year ended December 31, 2018 and the three months ended March 31, 2019, we incurred net loss of RMB56.4 million, RMB1,619.2 million (US$241.3 million) and RMB551.8 million (US$82.2 million), respectively, primarily attributed to the expenses in relation to the startup and fast expansion of our business.

We intend to further increase our brand awareness, expand our customer base and store network, and expect to continue to invest heavily in offering discounts and deals and other aspects of our business, especially sales and marketing expenses, in the foreseeable future as we continue to expand our store network and our product offerings. In addition, our net revenues will be impacted by various factors, including the performances of our stores, level of discounts we offer for different products, competitive landscape, customer preference and macroeconomic and regulatory environment. Therefore, our revenues may not grow at the rate we expect and it may not increase sufficiently to offset the

increase in our expenses. We may continue to incur losses in the future and we cannot assure you that we will eventually achieve our intended profitability.

70.     Regarding the purported rapid growth that was fueling investor interest in the Company at the time of the IPO, the Registration Statement and Prospectus stated that it was another contingent risk that Luckin management might not be able to manage such growth and expansion. As evidence of this, the Registration Statement and Prospectus stated, in part, the following:

**If we are unable to successfully manage our rapid growth, our business and prospects may be materially and adversely affected.**

As we continue to grow rapidly, we will continue to encounter challenges in implementing our managerial, operating and financial strategies to keep up with our growth. The major challenges in managing our business growth include, among other things:

- effectively identifying and securing locations for new stores and managing the daily operations of our stores. See "—We may be unsuccessful in operating our stores" for more details;

- controlling incurred costs in a competitive environment;

- effectively managing our supply chain and ensuring our third-party suppliers continue to meet our quality and other standards and satisfy our future operations' needs;

- maintaining and upgrading our technology systems in a cost-effective manner;

- attracting, training and retaining a growing workforce to support our operations;

- implementing a variety of new and upgraded internal systems and procedures as our business continues to grow; and

- ensuring full compliance with relevant laws and regulations.

All efforts to address the challenges of our growth require significant managerial, financial and human resources. We cannot assure you that we will be able to execute managerial, operating and financial strategies to keep up with our growth. If we are not able to manage our growth or execute our strategies effectively, our

growth may slow down and our business and prospects may be materially and adversely affected.

71.     Despite the certain scrutiny, which was foreseeable at the time of the IPO given the true undisclosed condition of the Company, the Registration Statement and Prospectus stated that such critical scrutiny of Luckin was again, a mere contingency uncertain to occur at some unknown time. As evidence of this, the Registration Statement and Prospectus stated, in part, the following:

> **We may increasingly become a target for public scrutiny, including complaints to regulatory agencies, negative media coverage, and malicious allegations, all of which could severely damage our reputation and materially and adversely affect our business and prospects.**
>
> Publicity about our business creates the possibility of heightened attention from the public, regulators and the media. Heightened regulatory and public concerns over customer protection and customer safety issues may subject us to additional legal and social responsibilities and increased scrutiny and negative publicity over these issues, due to our large number of transactions and continued business expansion. Any negative report regarding our business, financial condition and results of operations could damage our brand image and severely affect the sales of our products and possibly lead to product liability claims, litigations or damages. In addition, improper behaviors or statements of our spokespersons, endorsers and other celebrities we have cooperated with and our employees may result in substantial harm to our brand, reputation and operations. There is no assurance that we would not become a target for regulatory or public scrutiny in the future or that scrutiny and public exposure would not severely damage our reputation as well as our business and prospects.

### Materially False and Misleading Statements Contained in
### the Secondary Offering Prospectus & Registration Statement

72.     Having raised over $645 million from its IPO only months before, and having artificially inflated those shares to as high of over $45 per share on January 9, 2020, the following day, January 10, Luckin conducted its Secondary Offering of 13.8 million ADS shares priced at $42.00 each. In addition, the Underwriters also received a 30-day option to purchase up to an additional 2.02 million ADS shares from the Company and Selling Shareholders to cover

over-allotments (1.35 million by the Company and 720,000 by Selling Shareholders).[6] Gross proceeds from the sale of these ADS, including the oversubscription allotments, totaled over US$ 666.54 million – with over $230 million realized by the Selling Shareholders. On January 13, 2020, the first trading day following the Secondary Offering, shares of the Company traded to $47.66. Over the two trading days, over 46.5 million shares traded in a highly efficient market.[7]

73.     The Luckin Secondary Offering was made through an underwriting syndicate led by Credit Suisse, Morgan Stanley, CICC and Haitong. In connection with the Initial Public Offering, Underwriters received proceeds of at least $23.329 million.

74.     The January 7, 2020 Form F-1 Registration Statement was signed by Defendants Lu, Qian, J. Liu, Guo, Li, E. Liu, Schakel, Shao and Meier.

75.     In connection with the January 2020 Secondary Offering, on January 7, 2020, Defendants filed with the Securities and Exchange Commission, pursuant to Form F-1, a Registration Statement in connection with the ultimate registration for sale of 15.87 million

---

[6] On January 17, 2020, Luckin announced the full exercise of the Underwriters Option to purchase additional American Depositary Shares pursuant to the Secondary Offering, including the issuance of an additional 1.35 million ADSs, each representing eight Class A ordinary shares of the Company, and 0.72 million ADSs offered by the selling shareholder, at US$42.00 per ADS, pursuant to the exercise in full of the Underwriters' Option. At the same time, the Company also announced the closing of the issuance of an additional US$60 million in aggregate principal amount of the previously announced concurrent offering of Convertible Senior Notes of the Company (the "Concurrent Note Offering").

[7] Concurrent with the January 2020 Secondary Offering of ADSs and pursuant to a separate Offering Memorandum, the Company also offered to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A under the Securities Act of 1933 as amended, or the Securities Act, and to certain non-U.S. persons in offshore transactions in reliance on Regulation S under the Securities Act, US$400,000,000 aggregate principal amount of Luckin's 0.75% Convertible Senior Notes due 2025, or a total of US$460,000,000 aggregate principal amount of the notes if the initial purchasers in the Concurrent Convertible Note Offering exercise in full their option to purchase additional notes. Neither the offering of ADSs nor the offering of the Notes was contingent upon the consummation of the other transaction.

Luckin ADS shares. The initial Form F-1 listed the number of shares expected to be sold at only 12 million. On January 9, 2020, however, the Company filed an Amendment to its Form F-1, pursuant to Form F-1MEF, which designated that an aggregate of 13,800,000 American Depositary Shares, representing 110,400,000 Class A Ordinary Shares of the Company, would be sold and, at the election of the Underwriters to the Offering, up to 2,070,000 additional American Depositary Shares, representing 16,560,000 Class A Ordinary Shares, would also be sold to the public in the Secondary Offering. Later, on January 10, 2020 in connection with the Secondary Offering, Defendants also filed with the SEC, pursuant to Form 424(B)4, a copy of its Prospectus that constituted part of the Form F-1 Registration Statement. The statements contained in the Form F-1 Registration Statement and the 424(B)4 Prospectus were both the same or substantially similar.

76.     In addition to describing the terms and conditions of the Offering itself, the Secondary Offering Registration Statement and Prospectus contained statements that attested to the financial strength and well-being of the Company, as well as statements concerning Luckin's internal controls and procedures, management systems, and its accounting and auditing procedures and policies.

77.     The statements contained in the January 2020 Registration Statement and Prospectus were also the same or substantially similar to the statements contained in the May 2019 Registration Statement and Prospectus, including such statements concerning the Company's Internal Control Over Financial Reporting, Accordance with Generally Accepted Accounting Policies, other Critical Accounting Policies, Controls & Procedures and the purported Risk Disclosures that were then material to investors.

78.     In addition to the foregoing, the January 2020 Secondary Offering Prospectus and Registration Statement also purported to report financial results for the nine months ended September 30, 2019, as follows:

| | Notes | For the nine months ended September 30, | | |
| | | 2018 | 2019 | |
| | | RMB | RMB | US$ |
| **Net revenues:** | | | | |
| Freshly brewed drinks | | 302,759 | 2,165,614 | 302,981 |
| Other products | | 44,249 | 642,662 | 89,912 |
| Others | | 28,254 | 120,940 | 16,920 |
| **Total net revenues** | | **375,262** | **2,929,216** | **409,813** |
| Cost of materials | | (236,838) | (1,462,763) | (204,648) |
| Store rental and other operating costs | | (292,710) | (1,131,136) | (158,252) |
| Depreciation expenses | | (47,811) | (280,979) | (39,310) |
| Sales and marketing expenses | | (457,728) | (1,115,872) | (156,116) |
| General and administrative expenses | | (232,236) | (684,836) | (95,812) |
| Store preopening and other expenses | | (62,174) | (61,318) | (8,579) |
| **Total operating expenses** | | **(1,329,497)** | **(4,736,904)** | **(662,717)** |
| **Operating loss** | | **(954,235)** | **(1,807,688)** | **(252,904)** |
| Interest income | | 3,716 | 47,538 | 6,651 |
| Interest and financing expenses | | (7,982) | (24,098) | (3,371) |
| Foreign exchange gain, net | | 15,627 | 29,741 | 4,161 |
| Other expenses | | (6,288) | (2,092) | (293) |
| Change in the fair value of warrant liability | 7 | (991) | (8,322) | (1,164) |
| **Net loss before income taxes** | | **(950,153)** | **(1,764,921)** | **(246,920)** |
| Income tax expense | | — | — | — |
| **Net loss** | | **(950,153)** | **(1,764,921)** | **(246,920)** |

| | | | | |
|---|---|---|---|---|
| Add: accretion to redemption value convertible redeemable preferred shares | 12 | (793,992) | (552,036) | (77,233) |
| Add: deemed distribution to a certain holder of Series B Preferred Shares | | — | (2,127) | (298) |
| **Net loss attributable to the Company's Ordinary Shareholders** | | **(1,744,145)** | **(2,319,084)** | **(324,451)** |
| **Loss per share:** | | | | |
| Basic and diluted | 12 | (2.81) | (1.54) | (0.22) |
| **Weighted average shares outstanding used in calculating basic and diluted loss per share:** | | | | |
| Basic and diluted | 12 | 620,975,275 | 1,502,999,505 | 1,502,999,505 |
| **Other comprehensive loss, net of tax of nil:** | | | | |
| Foreign currency translation difference, net of tax of nil | | 7,732 | 100,824 | 14,106 |
| **Total comprehensive loss** | | **(1,736,413)** | **(2,218,260)** | **(310,345)** |

79.     The January 2020 Secondary Offering Registration Statement and Prospectus also reported on purported "Key Operating Data," for the nine months ended September 30, 2019, as follows:

| | For the three months ended or as of | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | December 31, 2017 | March 31, 2018 | June 30, 2018 | September 30, 2018 | December 31, 2018 | March 31, 2019 | June 30, 2019 | September 30, 2019 |
| **Total coffee stores** | **9** | **290** | **624** | **1,189** | **2,073** | **2,370** | **2,963** | **3,680** |
| Pick-up stores | 4 | 83 | 356 | 903 | 1,811 | 2,163 | 2,741 | 3,433 |
| Relax stores | 5 | 15 | 22 | 45 | 86 | 109 | 123 | 138 |
| Delivery kitchens | 0 | 192 | 246 | 241 | 176 | 98 | 99 | 109 |
| **Cumulative number of transacting customers (in thousands)[1]** | **11.1** | **485.0** | **2,917.8** | **5,984.3** | **12,529.5** | **16,872.3** | **22,777.5** | **30,723.7** |
| **Average monthly transacting customers (in thousands)[2]** | **4.0** | **179.5** | **1,207.6** | **1,877.4** | **4,325.9** | **4,402.0** | **6,166.0** | **9,339.7** |
| **Average monthly total items sold (in thousands)[3]** | **8.6** | **487.5** | **4,001.0** | **7,760.3** | **17,645.1** | **16,275.8** | **27,593.0** | **44,244.6** |
| Freshly brewed drinks | 8.0 | 451.7 | 3,743.7 | 6,220.4 | 13,418.8 | 13,077.2 | 21,055.7 | 34,655.4 |
| | | | | | | | | 9,589.2 |
| Other products | 0.5 | 35.8 | 257.3 | 1,539.9 | 4,226.4 | 3,198.6 | 6,537.3 | |

80.     The Registration Statement and Prospectus issued in connection with the IPO and Secondary Offering were negligently prepared and contained untrue statements of material fact and omitted to disclose facts necessary to make the statements contained therein not materially misleading. As investors ultimately learned following the end of the Class Period, the statements

contained in Luckin's May 2019 Prospectus issued in connection with the Company's Initial Public Offering and incorporated into its Registration Statement, and those statements made in connection with the Registration of the Company's January 2020 Secondary Offering, referenced above, were each materially false and misleading, for the following reasons, among others:

(a) At the time of the IPO and throughout the relevant period, it was not true that the Company's purported success was the result of management's ability to manage its rapid growth and expansion when, in fact, throughout the relevant period, Defendants had artificially inflated the Company's net revenues by as much as 40% for the year by engaging in fraudulent financial reporting and fraud;

(b) At the time of the IPO and throughout the relevant period , it was not true that Defendants had mediated past control and reporting deficiencies such that it was reasonable for investors to buy ADS shares of the Company or such that the risk disclosures warned of the true risks involved in investing in Luckin at that time;

(c) At the time of the IPO and throughout the relevant period , Defendants had presented a financial statement and balance sheet that had each materially overstated the Company's profitability by under-reporting the costs necessary to install within the Company the necessary systems of internal financial and operational control, and control over financial reporting, and by failing to make proper, timely adjustments to the Company's operational and financial reports;

(d) At the time of the IPO and throughout the relevant period , it was also not true that Luckin contained adequate systems of internal operational or financial controls, such that Luckin's reported financial statements could be assured to be true, accurate or reliable;

(e)     As a result of the foregoing, at the time of the IPO and throughout the relevant period, it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules; and

(f)     As a result of the aforementioned adverse conditions that Defendants failed to disclose, at the time of the IPO and throughout the relevant period, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Luckin could achieve guidance sponsored and/or endorsed by Defendants.

<div align="center">

**Defendants' Materially False and Misleading
Statements Made During the Class Period**

</div>

81.     The Class Period for claims arising under §10-b of the Securities Exchange Act of 1934 begin on May 17, 2019, the date that shares of the Company commenced trading on the Nasdaq, and the date that Defendants filed the Form 424(B)4 Prospectus that formed part of the previously filed Registration Statement.

82.     In total, having sold over $645 million of Company shares to the public pursuant to a materially false and misleading Registration Statement and Prospectus in connection with the May 17, 2019 IPO, which Defendants also knew or recklessly disregarded were false and misleading at the time of the IPO, for the reasons stated below, *infra* in ¶¶98-99, Defendants next embarked on a scheme and illegal course of conduct whereby they attempted to artificially inflate and maintain the price of Luckin shares by issuing an additional series of materially false and misleading statements that Defendants also knew or recklessly disregarded were materially false and misleading at the time of publication. The artificial inflation in the price of Luckin shares also allowed the officers and directors of the Company, including certain of the Defendant(s) named herein, to sell over $230 million of their artificially inflated Luckin shares

while in possession of material adverse, non-public information about the Company during the Class Period.

83.     As evidence of the additional materially false and misleading statements made by Defendants during the Class Period which they knew or recklessly disregarded was false and misleading at such time, on August 14, 2019, Defendants published a release that purported to announce results for 2Q:19, the period ended June 30, 2019. In addition to announcing that purported net revenues from products increased over 698% yr/yr with 5.9 million new customers purportedly acquired during 2Q:19. This release also stated that Luckin was "approaching" the critical metric of store-level break-even and provided other purported information to investors, in part, as follows:

Company Approaching Store Level Break-Even Point

Luckin Coffee Inc. Announces Unaudited Second Quarter 2019 Financial Results

BEIJING, Aug. 14, 2019 (GLOBE NEWSWIRE) -- Luckin Coffee Inc. ("Luckin Coffee" or the "Company") (NASDAQ: LK), a pioneer of a technology-driven new retail model to provide coffee and other products of high quality, high affordability, and high convenience to customers, today announced its unaudited financial results for the second quarter ended June 30, 2019.

**SECOND QUARTER 2019 HIGHLIGHTS**

- Total net revenues from products in the quarter were RMB870.0 million (US$126.7 million), representing an increase of 698.4% from RMB109.0 million in the same quarter of 2018.

- Cumulative number of transacting customers increased to 22.8 million from 2.9 million as of the end of the second quarter of 2018. During the second quarter of 2019, the Company acquired 5.9 million new transacting customers.

- Average monthly transacting customers in the quarter were 6.2 million, representing an increase of 410.6% from 1.2 million in the second quarter of 2018.

- Average monthly total items sold in the quarter were 27.6 million, representing an increase of 589.7% from 4.0 million in the second quarter of 2018.

41

- Total number of stores at the end of the quarter were 2,963 stores, representing an increase of 374.8% from 624 stores at the end of the second quarter of 2018.

- Store level operating loss in the quarter was RMB55.8 million (US$8.1 million), decreasing from a loss of RMB81.7 million in the second quarter of 2018.

84.     In addition to the foregoing, Defendant Qian, Chief Executive Officer of Luckin, used this release to condition investors to believe that the Company was executing against its plan and that Luckin was maintaining adequate systems of financial and operational internal controls as it expanded rapidly. As evidence of this, the release quoted Defendant Qian, in part, as follows:

"We are pleased with the performance of our business as we continue to execute against our long-term growth plan," said [Defendant] Qian... "Total net revenues from products sold increased 698.4% year-over-year, driven by a significant increase in transacting customers, an increase in the average number of items purchased by our transacting customers and higher effective selling prices. We believe this is the result of our distinguished value proposition of delivering our customers high quality, high convenience and high affordability."

[Defendant] Qian continued, "At the same time we have substantially reduced our store operating loss as a percentage of net revenues as a result of benefits of scale and increased bargaining power, operating efficiency from technology, and higher store throughput, and we are on track to reach our store level break-even point during the third quarter of 2019."

85.     The August 14, 2019 releases also contained a purported summary of the Company's 2Q:19 Financial Results, in part, as follows:

SECOND QUARTER 2019 UNAUDITED FINANCIAL RESULTS

Total net revenues were RMB909.1 million (US$132.4 million) in the second quarter, representing an increase of 648.2% from RMB121.5 million in the second quarter of 2018. Net revenues growth was primarily driven by a significant increase in the number of transacting customers, an increase in effective selling prices, and the number of products sold.

- Net revenues from freshly brewed drinks were RMB659.2 million (US$96.0 million), representing 72.5% of total net revenues in the second quarter of

2019, compared to RMB100.5 million, or 82.7% of total net revenues, in the second quarter of 2018.

- Net revenues from other products were RMB210.8 million (US$30.7 million), representing 23.2% of total net revenues in the second quarter of 2019, compared to RMB8.4 million, or 7.0% of total net revenues, in the second quarter of 2018.

- Other revenues, which mainly include delivery fees, were RMB39.1 million (US$5.7 million), representing 4.3% of total net revenues in the second quarter of 2019, compared to RMB12.5 million, or 10.3% of total net revenues, in the second quarter of 2018.

- Total operating expenses were RMB1,598.8 million (US$232.9 million), representing an increase of 243.9% from RMB465.0 million in the second quarter of 2018. The increase in operating expenses was in line with business expansion. Meanwhile, operating expenses as a percentage of net revenues decreased to 175.9% in the second quarter of 2019 from 382.7% in the second quarter of 2018, mainly driven by increased economies of scale and the Company's technology-driven operations.

- Cost of materials were RMB465.8 million (US$67.9 million), representing an increase of 514.8% from RMB75.8 million in the second quarter of 2018, in line with the increase in sales of products.

- Store rental and other operating costs were RMB371.5 million (US$54.1 million), representing an increase of 271.7% from RMB99.9 million in the second quarter of 2018, mainly due to increases in the number of stores and headcount.

- Depreciation expenses were RMB88.5 million (US$12.9 million), representing an increase of 491.0% from RMB15.0 million in the second quarter of 2018, mainly due to increases in depreciation of leasehold improvements and purchases of operating equipment.\

- Sales and marketing expenses were RMB390.1 million (US$56.8 million), representing an increase of 119.1% from RMB178.1 million in the second quarter of 2018, mainly due to increases in advertising expenses and delivery expenses as the Company launched new marketing initiatives and entered into new cities. Furthermore, free product promotion expenses increased in line with the growth of new transacting customers.

- General and administrative expenses were RMB265.8 million (US$38.7 million), representing an increase of 254.8% from RMB74.9 million in the second quarter of 2018. The increase in general and administrative expenses was mainly driven by business expansion, costs related to the Company's Initial Public Offering ("IPO"), and share-based compensation to senior management.

- Store preopening and other expenses were RMB17.2 million (US$2.5 million), representing a decrease of 19.4% from RMB21.3 million in the second quarter of 2018, mainly due to decreased rental costs before opening as a result of improved efficiency for new store openings.

86.    In addition to the foregoing, the August 14, 2019 release contained additional

purported financial and operational results including, in part, the following:

Operating loss was RMB689.7 million (US$100.5 million) compared to RMB343.4 million in the second quarter of 2018. Non-GAAP operating loss was RMB619.3 million (US$90.2 million) compared to RMB343.4 million in the second quarter of 2018. For more information on non-GAAP financial measures, please see the section of "Use of Non-GAAP Financial Measures" and the table captioned "Reconciliation of Non-GAAP Measures to the Most Directly Comparable GAAP Measures" set forth at the end of this press release.

Net loss was RMB681.3 million (US$99.2 million) compared to RMB333.0 million in the second quarter of 2018. Non-GAAP net loss was RMB610.8 million (US$89.0 million) compared to RMB333.0 million in the second quarter of 2018.

Basic and diluted net loss per ADS was RMB6.56(US$0.96) compared to a loss of RMB23.04 in the second quarter of 2018. Non-GAAP basic and diluted net loss per ADS was RMB3.28(US$0.48) compared to a loss of RMB6.80 in the second quarter of 2018.

Net cash used in operating activities was RMB375.2 million (US$54.7 million) compared to RMB196.0 million in the second quarter of 2018. The increase was primarily driven by an increase in operating expenses as a result of expansion of the Company's business operations.

Cash and cash equivalents and short-term investments were RMB6,051.2 million (US$881.5 million) as of June 30, 2019, compared to RMB1,761.0 million as of December 31, 2018. The increase was primarily driven by the net proceeds of US$158.8 million from the issuance of Series B-1 convertible redeemable preferred shares in April 2019 to certain investors and the net proceeds of US$657.2 million from the IPO and the concurrent private placement.

87.    The August 14. 2019 Release also contained purported forward Guidance as

follows:

GUIDANCE

For the third quarter ending 30 September 2019, the Company expects net revenues from products to be between RMB1.35 billion and RMB1.45 billion. This forecast reflects the Company's current and preliminary views, which are subject to change.

88.     The same day, August 14, 2019, in addition to key financial information purporting to reflect the quarterly performance of the Company, Defendants also filed Luckin's 2Q:19 Earnings Release with the SEC pursuant to Form 6-K, signed by Defendant Schakel as Chief Financial Officer and Chief Strategy Officer of the Company.

89.     Also on August 14, 2019, Defendants Lu (Chairman), Qian (CEO) and Schakel (CFO & CSO) each participated in the Company's regularly scheduled quarterly conference call for analysts and investors.[8] During this call, Defendant Lu stated, in part, the following:

**Charles Lu**
Okay, thank you, Bill. And I welcome everyone to our second quarter 2019 earnings conference call. First, I would like to congratulate the team on a strong performance during the second quarter. I'm very pleased with the progress we have made across all of our key metrics. I will also like to thank all our investors and partners for their support. The Chinese coffee market is highly underpenetrated. With our distinguished value propositions of high quality, high affordability and high convenience, we believe we have addressed the pain point for the Chinese coffee market, which will be we have -- we have significantly increased mass market consumption for coffee. We are very excited about those opportunities ahead of us and are very focused on a step-by-step execution.

90.     Immediately after reading his introductory remarks, Defendant Lu turned the call over to Defendant Qian to discuss detailed second quarter results. At that time, Defendant Qian stated, in part, the following:

**Jenny Qian**
Thank you, all, for attending Luckin Coffee's first earnings call after our successful IPO. It is a good quarter to have the opportunity to interact with you and discuss our performance during the second quarter. I'd like first to take this

---

[8] Conference Call Participants, included analysis from each of the Underwriter brokerages including: Tony Wang - Credit Suisse; Lillian Lou - Morgan Stanley; Eric Gonzalez - KeyBanc Capital Markets; Ro Chen – CICC; Billy Leung - Haitong International; and Vincent Yu – Needham & Company.

opportunity to thank all of our investors, partners and our customers for their tremendous trust and support. Thanks to you, we have been able to rapidly expand our operations and are on-track to be the largest coffee network by number of stores by the end of this year.

Please, beginning with Slide 4, we are very pleased with our results during the second quarter. Net revenues from product grew around 700% compared to last year. And we experienced more normalized growth compared to our seasonally lower first quarter, which was impacted by the Chinese New Year holiday. Revenue growth was driven by a significant increase in transacting customers and increase in the average number of items purchased by our transacting customers as well as high effective selling prices.

We believe this is the result of our distinguished value proposition by delivering our customers high quality, high convenience and high affordability. At the same time, we substantially reduced our store operating loss at the percentage of net revenues as the result of, first, benefits of scale and increased bargaining power; second, operating efficiency from technology; and third, higher stock throughput. Our CFO, Reinout, will speak today in our financial performance in more detail later. But now, I'm pleased to say, we are now on-track to reach our level breakeven at some point during the third quarter.

91.     Slide 4 of the 2Q:19 Investor Presentation showed the following:



92.     Defendant Qain continued through the presentation and presented additional analysis of more graphic data, in part, as follows:

As can be seen on Slide 5, we nearly doubled our net new store openings, which is 593 new stores in the second quarter on a sequential basis. We entered into 12 new cities in five new provinces. And also, you can see the breakdown of our

store counts. We continue to place strategic focus on the development of pick-up stores, which not only provide high convenience for our customers but also provide us with significant costs advantages.

Finally, we remain on-track to become the largest coffee network in China in terms of number of stores by the end of 2019. Please turn to Slide 6. Brand -- as mentioned earlier, we completed our IPO on NASDAQ in May this year. Our brand benefitted from additional awareness and global recognition. On the back of our IPO, we launched a nationwide campaign, the declaration of Luckin Coffee to advocate a coffee cartel in China, educate the consumers on coffee consumption and strengthen our brand identity.

<p style="text-align:center">*       *       *</p>

All in all, we are very happy with our results in the second quarter. Our revenue growth and technology-enabled business model has created barriers to entry providing us with a sustainable competitive advantage. I look forward to updating you on our progress in the near future.

93.     Slide 5 of the 2Q:19 Investor Presentation showed the following:



94.     Defendant Qian next turned the Presentation over to Defendant Schakel, CFO and CSO, who also purported to discuss the details of Luckin's 2Q:19 financial performance, and who also stated, in part, the following:

**Reinout Schakel**

I will discuss our financial results for Q2 in some more detail. If we move to Slide 11, you can see that our operating growth in the second quarter regained momentum from a seasonally slower first quarter that was impacted by Chinese

New Year holiday season. I'd highlight our average monthly items sold metric in particular, which saw returned to a more normalized growth trend. During the second quarter of 2019, we saw nearly as many items as in full year 2018, which illustrates our rapid expansion.

Our net revenue breakdown can be found on Slide 12. Net revenue from products grew just under 700% year-over-year and 95% sequentially driven by more transacting customers, an increase in the number of items purchased per transacting customers and higher effective selling prices, which we calculated by dividing our net revenues from products by the total number of items transacted during the period. It is worth noting that net revenues from other products as a percentage of total net revenues increased significantly to 23.2%, our highest quarterly contribution to-date as we expanded our product offering. At the same time, we further reduced our cost base and significantly reduce our store level loss as a percentage of net revenues from products to negative 6% during the quarter from a loss of negative 75% during the same period last year.

As Jenny mentioned earlier, we remain on-track to reach our store level breakeven point at some point during the third quarter of 2019. Reduction of our store level costs is best illustrated on Slide 13. As you can see, we have further reduced our per cup cost to RMB11.1 from RMB18.1 during Q2 2018. This is largely driven by benefits of scale and increased bargaining power, operating efficiency from technology and higher store throughput.

95.    Slide 11, 12 and 13 of the 2Q:19 Investor Presentation showed the following:





96.     Defendant Schakel continued his presentation and further discussed Luckin's

detailed 2Q:19 financial performance and stated, in part, the following:

> Store throughput measured as the average number of items sold per store per day
> increased to 345 items during the quarter from 292 items during the same period
> last year as we expanded our product offering and our transacting customers are
> buying our products more frequently. Moving to Slide 14, the percentage of
> delivery orders organically declined to 19.8% during Q2 2019. This reinforces the
> fact that Luckin is a pick-up model, not a delivery model. As many of you know,
> we utilized deliveries strategically. As we enter new markets, we typically opened
> centralized kitchens from where we deliver our orders to ensure high convenience

from day one. We then used the data we collect -- for our delivery orders to highlight areas with high demands for our products, so-called heat maps. This information allows us to more precisely identify ideal locations to open up our pick-up stores.

And as pick-up store density increases in a given market, we can replicate the convenience of delivery at a much lower cost. And this also explains the further reduction of net delivery subsidy to RMB0.8 per item during the quarter. If we move to Slide 15, as mentioned by Jenny, we have invested in our brand and further strengthened our brand identity during the quarter. Our total sales and marketing expenses in Q2 '19 amounted to RMB390.1 million versus RMB168.1 million in Q1 2019. This represents close to 62% -- 63% of our total non-GAAP operating loss in the second quarter. Please note that our sales and marketing expenses do not include any of our promotions or coupons as these are already reflected in our net revenue from products. The increase in sales and marketing expenses is predominantly related to investments in advertising, which amounted to RMB245.4 million for the quarter from RMB43.7 million during the previous quarter. This, for us, is a very strategic investment at this stage of our development as we believe a strong brand will enable us to continue to attract and retain customers.

And as you can see on this page, this has already resulted in strong growth of new transacting customers during the quarter. I would also like to point out that despite increased spending on sales and marketing year-over-year, new customer acquisition costs declined to around RMB48 in the second quarter from around RMB55 in the same period last year. This is largely due to benefits of scale, effective user engagement via our proprietary mobile app and a substantially higher number of transacting customers. At the same time, you can see from the chart on the right that the transaction value per customer per month for each cohort generally increases as each customer cohort matures. We believe this is a result of our distinguished value proposition and our very well-recognized brand. If we move to Page 16, you can see that we are very well-capitalized. Our liquidity, which includes cash and cash equivalents and short-term investments, exceeded RMB6 billion as of June 30, 2019. The increase in our liquidity was primarily driven by the net proceeds of the Series B investment, our successful IPO and the concurrent appraisement during the quarter. We also significantly improved our rate of operational cash burn to negative RMB375 million this quarter from negative RMB628 million during the previous quarter.

97.     In concluding the 2Q:19 Earnings Presentation, Defendant Schakel provided

purported forward guidance, in part, as follows:

This brings us to the end of the presentation. As Charles and Jenny mentioned, we are very pleased with the results achieved during the second quarter of this year. In terms of our guidance for the third quarter ending September 30, 2019, we

expect net revenues from products to be between RMB1.3 billion and RMB1.45 billion, representing an increase of 495% and 539% year-over-year, respectively.

98.     The statements contained in Luckin's August 14, 2019 release and those statements contained in the Company's Form 6-K, and those statements made by Defendants during the 2Q:19 quarterly Presentation for investors and analysts, also on August 14, 2019, referenced above, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)     At the time, it was not true that the Company's purported success was the result of management's ability to manage its rapid growth and expansion when, in fact, throughout the Class Period, Defendants had artificially inflated the Company's net revenues by as much as 40% by engaging in fraudulent financial reporting and fraud;

(b)     At the time, it was not true that Defendants had mediated past control and reporting deficiencies such that it was reasonable for investors to buy ADS shares of the Company or such that the risk disclosures warned of the true risks involved in investing in Luckin at that time;

(c)     At the time, Defendants had presented a financial statement and balance sheet that had each materially overstated the Company's profitability by under-reporting the costs necessary to instill within the Company the necessary systems of internal financial and operational control, and control over financial reporting, and by failing to make proper, timely adjustments to the Company's operational and financial reports;

(d)     At the time, it was also not true that Luckin contained adequate systems of internal operational or financial controls, such that Luckin's reported financial statements could be assured to be true, accurate or reliable;

(e)     As a result of the foregoing, at the time, it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP and SEC rules; and

(f)     As a result of the aforementioned adverse conditions that Defendants failed to disclose, at the time, Defendants lacked any reasonable basis to claim that the Company was operating according to plan, or that Luckin could achieve guidance sponsored and/or endorsed by Defendants.

99.     In addition to the foregoing, it was also false and misleading and was known to Defendants to be materially false at that time, or was recklessly disregarded as such thereby to make the specific representations identified above, for the following reasons, among others:

(a)     As a result of Defendants fraudulent business practices that had *already* begun by the time of the IPO and continued throughout the Class Period, it was not true that Luckin stores were approaching the critical break-even level;

(b)     As a result of Defendants fraudulent business practices that had already begun by the time of the IPO and continued throughout the Class Period, it was not true that Luckin had reported an almost 700% increase in revenues, when as much as 40% of those sales may have been fabricated;

(c)     As a result of Defendants fraudulent business practices later identified by the Anonymous Report, published in January 2020, throughout the Class Period Defendants had artificially inflated the customer count and number of products sold at a material number of locations and, accordingly, all statements regarding such metrics were also materially false and misleading and were known to be false or recklessly disregarded as such thereby, at that time and throughout the Class Period;

(d)     As a result of the fraudulent accounting and lack of controls and procedures that existed at Luckin at that time and throughout the Class Period, it was materially false and misleading for Defendant Qain or Lu to represent that the performance of the Company's business was continuing to execute according to a long-term growth plan;

(e)     As a result of the material fabrication of revenues, Defendants had also overstated cash flows and understated the true cost of revenues and operating costs, accordingly all statements regarding such metrics were also materially false and misleading and were known to be false or recklessly disregarded as such thereby, at that time and throughout the Class Period; and

(f)     As a result of the fraudulent artificial inflation of revenues and under reporting of costs and expenses, the graphic representations made by Defendants during the Company's 2Q:19 Presentation for analysist and investors, as demonstrated in part herein, *supra*, were each materially false and misleading and were known to be false or recklessly disregarded as such thereby, at that time and throughout the Class Period.

100.    As further evidence of additional materially false and misleading statements made by Defendants during the Class Period which they knew or recklessly disregarded was false and misleading at such time, on November 13, 2019, Defendants published a release that purported to announce results for 3Q:19, the period ended September 30, 2019. In addition to announcing that purported net revenues exceeded the high end of guidance, this release also stated that Luckin had achieved a Store-Level Profit Margin of 12.5%, and provided other purported positive financial and operational information to investors, in part, as follows:

**Net Revenues from Products of RMB1.5 Billion, Exceeding High End of Guidance Range**

Store Level Operating Profit Margin of 12.5% for the Quarter

BEIJING, Nov. 13, 2019 (GLOBE NEWSWIRE) -- Luckin Coffee Inc. ("Luckin Coffee" or the "Company") (NASDAQ: LK), a pioneer of a technology-driven new retail model to provide coffee and other products of high quality, high affordability, and high convenience to customers, today announced its unaudited financial results for the third quarter ended September 30, 2019.

THIRD QUARTER 2019 HIGHLIGHTS

- Total net revenues from products in the quarter were RMB1,493.2 million (US$208.9 million), representing an increase of 557.6% from RMB227.1 million in the same quarter of 2018.

- Average monthly total items sold in the quarter were 44.2 million, representing an increase of 470.1% from 7.8 million in 3Q:18.

- Cumulative number of transacting customers increased to 30.7 million, representing an increase of 413.4% from 6.0 million as of the end of the third quarter of 2018. During the third quarter of 2019, the Company acquired 7.9 million new transacting customers.

- Average monthly transacting customers in the quarter were 9.3 million, representing an increase of 397.5% from 1.9 million in the 3Q:18.

- Total number of stores at the end of the quarter were 3,680 stores, representing an increase of 209.5% from 1,189 stores at the end of 3Q:18.

- Average total net revenues from products per store in the quarter were RMB449.6 thousand (US$62.9 thousand), representing an increase of 79.5% from RMB250.5 thousand in the same quarter of 2018.

- Store level operating profit in the quarter was RMB186.3 million (US$26.1 million), or 12.5% of net revenues from products, compared to a loss of RMB126.0 million in the 3Q:2018.

101.    In addition to the foregoing, Defendant Qian, Chief Executive Officer of Luckin, again used the Company's release to condition investors to believe that Luckin was executing against its plan and that Luckin was maintaining adequate systems of financial and operational internal controls as it expanded rapidly. As evidence of this, the November 13, 2019 release again quoted Defendant Qian, in part, as follows:

"We are very pleased with our results in the third quarter. We exceeded the high-end of our guidance range, achieved a store level profit margin of 12.5% and experienced continuous growth across all key operating metrics. These

54

achievements follow a clear trend: an increase in volumes, efficiency and, as a result, profitability. During the quarter, product revenue grew at 557.6%, which was 1.2x, 1.4x and 2.7x the growth rate of average monthly items sold, average monthly transacting customers, and number of stores, respectively[.]"

"During the third quarter, sales from freshly-brewed coffee drinks continued to maintain very strong growth, and we believe we will reach our goal to become the largest coffee player in China by the end of this year. With our distinguished value proposition of high quality, high affordability and high convenience we believe that Luckin Coffee has become part of more and more Chinese consumers' daily lives. China's coffee market remains highly underpenetrated so we are very excited about the growth potential ahead of us[.]"

"At the same time, we continued to enrich our product offerings during the quarter. We launched Luckin Tea products nationwide in July 2019 and experienced strong incremental demand during the quarter, contributing to an increase in per store revenue and higher customer retention rate. We also started selling cups and other merchandise products and entered into a joint venture agreement with Louis Dreyfus Company to produce and sell co-branded Not From Concentrate juice products."

\*     \*     \*

"With our disruptive technology-driven new retail model and our newly-launched retail partnership model, we believe we can rapidly expand into adjacent markets with limited capital expenditures while maintaining a high degree of operational control and efficiency. We are pleased to have taken meaningful steps accomplishing our goals this quarter and remain extremely excited about the future of our business[.]"

102.    The November 13, 2019 releases also contained a purported summary of the

Company's 3Q:19 Financial Results, in part, as follows:

THIRD QUARTER 2019 UNAUDITED FINANCIAL RESULTS

Total net revenues were RMB1,541.6 million (US$215.7 million) in the third quarter, representing an increase of 540.2% from RMB240.8 million in the third quarter of 2018. Total net revenues from products were RMB1,493.2 million (US$208.9 million) in the third quarter, representing an increase of 557.6% from RMB227.1 million in the third quarter of 2018. Net revenues from products growth was primarily driven by a significant increase in the number of transacting customers, an increase in effective selling price, and an increase in the number of products sold per transacting customer.

- Net revenues from freshly brewed drinks were RMB1,145.4 million (US$160.2 million), representing 74.3% of total net revenues in the third

quarter of 2019, compared to RMB192.7 million, or 80.0% of total net revenues, in the third quarter of 2018.

- Net revenues from other products were RMB347.8 million (US$48.7 million), representing 22.6% of total net revenues in the third quarter of 2019, compared to RMB34.4 million, or 14.3% of total net revenues, in the third quarter of 2018.

- Other revenues, which mainly include delivery fees, were RMB48.4 million (US$6.8 million), representing 3.1% of total net revenues in the third quarter of 2019, compared to RMB13.7 million, or 5.7% of total net revenues, in the third quarter of 2018.

- Total operating expenses were RMB2,132.5 million (US$298.3 million), representing an increase of 193.6% from RMB726.4 million in the third quarter of 2018. The increase in operating expenses was the result of business expansion. Meanwhile, operating expenses as a percentage of net revenues decreased to 138.3% in the third quarter of 2019 from 301.7% in the third quarter of 2018, mainly driven by increased economies of scale and the Company's technology-driven operations.

- Cost of materials were RMB721.1 million (US$100.9 million), representing an increase of 375.5% from RMB151.6 million in the third quarter of 2018, as a result of the increase in sales of products. Cost of materials decreased to 48.3% as a percentage of net revenues from products in the third quarter of 2019 from 66.8% in the third quarter of 2018.

- Store rental and other operating costs were RMB477.3 million (US$66.8 million), representing an increase of 176.6% from RMB172.5 million in the third quarter of 2018, mainly due to increases in the number of stores and headcount. Store rental and other operating costs decreased to 32.0% as a percentage of net revenues from products in the third quarter of 2019 from 76.0% in the third quarter of 2018.

- Depreciation expenses were RMB108.5 million (US$15.2 million), representing an increase of 275.8% from RMB28.9 million in the third quarter of 2018, mainly as the result of increases in depreciation of leasehold improvements and the increase in the purchases of equipment for operation due to the increased number of stores. Depreciation expenses decreased to 7.3% as a percentage of net revenues from products in the third quarter of 2019 from 12.7% in the third quarter of 2018.

- Sales and marketing expenses were RMB557.7 million (US$78.0 million), representing an increase of 147.6% from RMB225.3 million in the third quarter of 2018, mainly due to increases in advertising expenses as the Company launched new marketing initiatives, entered into new cities and launched Luckin Tea as an independent brand. The increase in sales and marketing expenses reflect strategic investments in branding which,

management believes, will bring long-term benefits to the Company. All promotions and coupons provided to customers, other than free product promotion expenses, are reflected in net revenues from products and therefore not included in sales and marketing expenses. Sales and marketing expenses decreased to 36.2% as a percentage of net revenues in the third quarter of 2019 from 93.5% in the third quarter of 2018.

- General and administrative expenses were RMB246.1 million (US$34.4 million), representing an increase of 108.0% from RMB118.3 million in the third quarter of 2018. The increase in general and administrative expenses was mainly driven by business expansion and share-based compensation to senior management. General and administrative expenses decreased to 16.0% as a percentage of net revenues in the third quarter of 2019 from 49.1% in the third quarter of 2018.

- Store preopening and other expenses were RMB21.8 million (US$3.0 million), representing a decrease of 26.9% from RMB29.8 million in the third quarter of 2018, mainly due to decreased rental costs before opening as a result of improved efficiency for new store openings. Store preopening and other expenses decreased to 1.4% as a percentage of net revenues in the third quarter of 2019 from 12.4% in the third quarter of 2018.

103.     In addition to the foregoing, the November 13, 2019 release contained additional

purported financial and operational results including, in part, the following:

Operating loss was RMB590.9 million (US$82.7 million) compared to RMB485.6 million in the third quarter of 2018. Non-GAAP operating loss was RMB550.1 million (US$77.0 million), representing 35.7% of total net revenues, in the third quarter of 2019, compared to RMB485.6 million, or 201.7% of total net revenues, in the third quarter of 2018. For more information on non-GAAP financial measures, please see the section of "Use of Non-GAAP Financial Measures" and the table captioned "Reconciliation of Non-GAAP Measures to the Most Directly Comparable GAAP Measures" set forth at the end of this press release.

Net loss was RMB531.9 million (US$74.4 million) compared to RMB484.9 million in the third quarter of 2018. Non-GAAP net loss was RMB491.1 million (US$68.7 million), representing 31.9% of total net revenues, in the third quarter of 2019, compared to RMB483.9 million, or 201.0% of total net revenues, in the third quarter of 2018.

Basic and diluted net loss per ADS was RMB2.24(US$0.32) compared to a loss of RMB3.60 in the third quarter of 2018. Non-GAAP basic and diluted net loss per ADS was RMB2.08(US$0.32) compared to a loss of RMB3.52 in the third quarter of 2018.

Net cash used in operating activities was RMB122.8 million (US$17.2 million) compared to RMB719.6 million in the third quarter of 2018. The decrease was

primarily driven by a reduction of operating loss and a favorable working capital profile.

Cash and cash equivalents and short-term investments were RMB5,543.9 million (US$775.6 million) as of September 30, 2019, compared to RMB1,761.0 million as of December 31, 2018. The increase was primarily driven by the net proceeds of US$158.8 million from the issuance of Series B-1 convertible redeemable preferred shares in April 2019 to certain investors and the net proceeds of US$657.2 million from the IPO and the concurrent private placement.

104.    The November 13. 2019 Release also contained purported forward Guidance, as follows:

GUIDANCE

For the fourth quarter ending December 31, 2019, the Company expects net revenues from products to be between RMB2.1 billion and RMB2.2 billion. This forecast excludes any revenue generated from stores operated under the new retail partnership model. This forecast reflects the Company's current and preliminary views, which are subject to change.

105.    Also on November 13, 2019, Defendants Lu (Chairman), Qian (CEO) and Schakel (CFO & CSO) each participated in the Company's regularly scheduled quarterly conference call for analysts and investors.[9] During this call, Defendant Lu stated, in part, the following:

**Charles Lu**
Thank you, Bill. Good evening, and good morning, everyone. Thank you for your support for Luckin Coffee. Well, we are very pleased with our results in the third quarter: We exceed the high end of our guidance range, achieved a strong store level profit margin of 12.5% and outperformance across all other key metrics. Now these results are not surprising to us. It just follows a clear trend. Reinout will share the detail with you later.

During the quarter, sales from the coffee continued to maintain very strong growth. I believe Luckin Coffee will reach its goal to become the largest coffee player in China by the end of this year. For those who spend time in China, you

---

[9] Conference Call Participants, included analysis from each of the Underwriter brokerages including: Tony Wang - Credit Suisse; Jimmy Zheng - Morgan Stanley; Eric Gonzalez - KeyBanc Capital Markets; Ruochen Lv – CICC; Billy Leung - Haitong International; and Vincent Yu – Needham & Company.

can see that Luckin Coffee is already part of the daily lives in China. Everywhere you go, either large city in Beijing, Shanghai or in emerging cities like Chengdu, Tianjin, you will see our eye-catching brewed cups in the CBD area, universities and many other places. China's coffee market is still under-penetrated, and we believe Luckin is helping to drive the rapid growth of the coffee market in China.

At the same time, we continue to offer more products. During the quarter we launched Luckin Tea products, which has been a great success. We also started selling cups and other merchandise products. We also entered into a joint venture agreement with LDC to sell NFC juice. As a result, we experienced strong incremental demand and increase in revenue and higher customer retention rate.

*     *     *

I have been often asked why we are doing too much and too fast. I would say, no. In fact, this is a nature evolution of our business model. Since our inception, Luckin's goals has always been beyond everyone's expectations. This is because our business model is entire built on a technology completely different from a traditional retailer. With our fully technology-driven new retail partnership model, we believe we can rapidly expand with limited capital expenditures, while maintaining high quality and high efficiency, at the same time, increase our profitability.

106.    After reading his introductory remarks, Defendant Lu turned the call over to

Defendant Qian to discuss detailed 3Q:19 results. At that time, Defendant Qian stated, in part,

the following:

**Jenny Qian**
During this quarter, we outperformed all operational and financial metrics. Among which, product revenue was CNY 1.493 billion, an increase of 558% year-over-year. Store level had a profit margin of 5.5%. Other metrics matched or exceeded our expectations.

Now turning to Page 4. I would like to remind you that this quarter, the growth of product revenue is greater than the growth of the number of items sold. The growth of items sold is greater than the growth of transacting customers, and the growth of transacting customers is greater than the growth of stores. That shows that we are not just grow quickly, but also be able to improve efficiency and profitability at the same time. It also shows that the growth of the revenue is not only due to the growth of stores.

Please turn to Page 5. Branding is important to our business. Under our strategy, we will continue to significantly invest in branding from the second quarter 2019 to the second quarter of 2020. As a result, during this period, sales and marketing

fees will be relatively high. But starting the third quarter of 2020, this cost will return to normal….

Now please turn to Page 6. Last quarter, we successfully launched Luckin Tea products. The sales of Luckin Tea has increased 8x in the past 5 months. The per cup economics of Luckin Tea is similar to that of coffee….. Luckin Tea has helped us to improve customer retention rate and store throughput.

107. Slides 3, 5 and 6 of the 3Q:19 Investor Presentation represented the following:

**Q3 earnings highlights: strong performance across all key metrics**

| | | |
|---|---|---|
| Financial Metrics | Total net revenues from products [(1)]<br>RMB1,493.2mn<br>*+557.6% YoY increase* | Store level operating profit [(2)]<br>+12.5% store level profit margin [(3)]<br>*RMB186.3mn* |
| Operational Metrics | Store footprint<br>3,680 stores [(4)]<br>*+717 net new stores QoQ* | Cumulative transacting customers [(5)]<br>~30.7mn<br>*+7.9mn new customers QoQ* |
| | Average monthly total items sold [(6)]<br>~44.2mn items<br>*+470.1% YoY increase* | Average monthly transacting customers [(7)]<br>~9.3mn<br>*+397.5% YoY increase* |

Notes:
(1) Calculated as the sum of net revenues from freshly brewed drinks and net revenues from other products
(2) Calculated by deducting cost of materials, store rental & other operating costs and depreciation expenses from net revenues from freshly brewed drinks and from other products

**Continued strategic investments in branding**







108.    Defendant Qain continued through the presentation and presented more analysis

and graphic data, in part, as follows:

> Turning to Page 7. China's tea market has huge potentials. Last quarter, we separated Luckin Tea as an independent brand. Luckin Tea Coffee store and the Luckin Tea store have the following differences: First, Coffee store has more coffee SKU and a relatively limited tea SKU, while tea store has non-tea SKU with several coffee choices from only one coffee machine. The second, Coffee store mainly covers the first- and second-tier cities, while Tea store will cover the whole country, including fourth- and fifth-tier cities. The third, Coffee store is mainly self-operated, while Tea store will operate mainly under partnership model.

> \*        \*        \*

> Please turning to Page 8. Last quarter, we strategically launched the retail partnership model. Relying on our technology-driven new retail model, we can effectively control the quality of services and operation process.… We use a tiered revenue-sharing model, which means the partners do not need to pay upfront franchise fee and Luckin will only start sharing the revenue when they reach certain levels.

> \*        \*        \*

> Recently, we launched another popular snack, Luckin nuts. The revenue from non-coffee products increased from the 31% of 2018 to 45% in the third quarter this year. We believe that with more and more products offered, we could not only achieve higher customer retention rate, but also improve the store level profitability.

Please turn to the Page 10. Our growth strategy focused on 2 sides: On one hand, with more customers and increasing purchase frequency, lower down our procurement cost. On the other hand, with more doors and diversified products, we can bring more convenience to the customers and drive their consumption frequency. Luckin is on the way to realize our mission: To become part of everyone's everyday life, starting with coffee…

109.    Slide 9 of the 3Q:19 Investor Presentation purported to represent the following:

### Continue to enrich product offerings



110.    Defendant Qian next turned the Presentation over to Defendant Schakel, CFO and CSO, who discussed the additional details of Luckin's purported 3Q:19 financial performance, and who also stated, in part, the following:

**Reinout Schakel**
Thank you. Thanks, Jenny. Thanks, Charles. Hi. Good morning, and good evening, everyone on the call. I will briefly discuss our financial performance during the quarter, which we believe was very, very strong. If we move to Page 12. The graphs on Slide 12 illustrates our strong momentum across all aspects of our business. I'd like to specifically highlight the 24% sequential growth in our store growth versus the higher sequential growth in transacting customers as well as monthly items sold.

We remain on track to open 4,500 stores by year-end. And as Jenny mentioned, growth is not coming just from store openings, but also a significant improvement in store efficiency. Moving to Slide 13, you can see the significant progress we've made on profitability during the quarter. We reached a store level margin of 12.5% and saw a month-over-month improvement in the store level profit during the quarter. We also significantly reduced our non-GAAP net loss margin, despite

what we expect to be peak investments in sales and marketing during the quarter. The material improvement in profitability is the result of a very clear trend of strong growth of product revenue, increased store efficiency and further benefits of scale.

On Slide 14. First, I will discuss our product revenue growth. If you look at Slide 14, product revenue was above the high end of our range and grew more than 70%, sequentially. Illustrative of the improved store efficiency, you can see that the average product revenue grew even faster during the quarter. In terms of key underlying drivers. First, a very strong increase in the number of monthly transacting customers to 9.3 million, a 51% quarter-over-quarter increase. This was the result of successfully acquiring close to 8 million new customers during the quarter, a notable increase compared to last quarter and a further increase in the retention rate of our existing customers, partly driven by the success of Luckin Tea products.

Second, the average monthly items per transacting customer during the quarter increased to 4.7, an increase of 6% quarter-over-quarter, partly driven by introduction of new products. Third, the net selling price per item, which is calculated by dividing net product revenue by all items transacted, and as such, adjusted for free products as well as promotions and coupons, was CNY 11.2 for the quarter, an increase of 7% quarter-over-quarter. It is worth noting that the net selling price per item increased sequentially despite the buy 10, get 10 free promotion we offered when we announced the nationwide launch of the Luckin Tea products, which we did in July.

111.    Slides 12, 13 and 14 of the 3Q:19 Investor Presentation purported to represent the following:



112.    Defendant Schakel continued his presentation and further discussed the purported

details of Luckin's 2Q:19 financial performance and stated, in part, the following:

Moving to Slide 15 and 16. As a result of our high growth and significant
improvement in efficiency, you can see a very clear trend in the improvement of
our cost structure. This provides us with a lot of visibility in our profitability
trend, and we are, therefore, very confident that we can reach our company-level
breakeven point by the third quarter of 2020. If we look at our per cup costs on
Slide 16, you see a very similar trend. You can see that we continue to make
significant progress in reducing our per cup costs, and we already reached below
CNY 10 in Q3 from CNY 11.1 in the second quarter and CNY 16.4 in the last

quarter - in the third quarter of last year. The reduction in our per cup costs is driven by a decrease of fixed cost per cup as we materially increase store throughput. As you can see on the bottom of the page, the number of items sold per store per day materially increased to 444 during the quarter from 345 in the second quarter and 285 in the third quarter last year.

113.    Slides 15 and 16 of the 3Q:19 Investor Presentation purported to represent the following:





114.   Defendant Schakel concluded the 3Q:19 Investor Presentation by providing forward Guidance as follows:

> This brings us to the end of our formal presentation. In terms of guidance for the fourth quarter ending December 31, 2019, the company expects net revenue from products to be between CNY 2.1 billion and CNY 2.2 billion. This forecast excludes any revenue generated from stores operated under the new launched retail partnership model. This forecast reflects the company's current and preliminary views, which are subject to change.

115.   On November 20, 2019, in addition to key financial information purporting to reflect the quarterly performance of the Company, Defendants also filed Luckin's 3Q:19 Earnings Release with the SEC pursuant to Form 6-K, signed by Defendant Schakel as Chief Financial Officer and Chief Strategy Officer of the Company.

116.   The statements made by Defendants and contained in Luckin's November 13, 2019 Release and those statements contained in Luckin's 3Q:19 Form 6-K, and those statements made by Defendants during the 3Q:19 Presentation for investors and analysts, also held on November 13, were each materially false and misleading when made and were known by Defendants to be materially false and misleading at that time or were recklessly disregarded as such thereby, for the reasons stated herein in ¶¶98-99, *supra*.

117.   Between early November 2019 and mid-January 2020, shares of Luckin doubled in price – with the ADS trading on the Nasdaq from approximately $20 per share to an intra-day trading high of 51.38  on January 17. The chart below shows the dramatic increase in the price of Luckin ASDs from November 2019, leading up to the Secondary Offering in January 2020:



118.    Taking advantage of the artificial inflation in the price of Company ADS that was caused as a direct result of Defendants' publication of materially false and misleading statements which Defendants knew or recklessly disregarded were false and misleading at that time, on January 10, 2020, Defendants announced that Luckin had increased the size of its Secondary Offering to a total of 15.87 million shares – including: 9 million ADS sold by the Company; 4.8 million sold by selling shareholders, and then an additional 1.35 million ADS granted as Oversubscription shares to Underwriters, by the Company and 720,000 additional shares granted by Selling Shareholders. These ADS shares were sold at $42.00 each and resulted in gross proceeds of $231.84 million to the Selling Shareholders, Defendant Li, and gross offering proceeds of $666.54 million, including the sale of over-subscription shares.

119.    Concurrent with the Secondary Offering, Defendants also initiated a concurrent US$400 million Offering of Senior Convertible Notes due 2025, with an oversubscription option to purchase an additional US$60 million of Notes. The initial conversion rate of the Notes was 18.3150 ADSs per US$1,000 principal amount of such Notes; equivalent to an initial conversion

price of approximately US$54.60 per ADS and represented a conversion premium of approximately 30% above the price of the concurrent Secondary Offering of ADSs.[10]

120. On January 17, 2020, Luckin announced the full exercise of the Underwriters Option to purchase additional shares, including an additional 1.35 million American Depositary Shares, and 0.72 million ADSs offered by the Selling Shareholder, Defendant Li, at US$42.00 per ADS. The same day, the Company also announced the closing of the issuance of an additional US$60 million in aggregate principal amount of the previously announced concurrent Convertible Senior Notes Offering by the Company. Luckin announced that it received net proceeds of approximately US$418.3 million in aggregate from the ADS Secondary Offering, and net proceeds of approximately US$446.7 million in aggregate from the Concurrent Note Offering. The Company did not receive any proceeds from the sale of ADSs by the selling shareholder.

121. Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. LLC, China International Capital Corporation Hong Kong Securities Limited and Haitong International Securities Company Limited acted as the joint Book-Running Managers for the Secondary ADS Offering. KeyBanc Capital Markets Inc. and Needham & Company, LLC acted as co-Managers.

**MUDDY WATERS & THE ANONYMOUS SHORT-SELLERS REPORT**

122. On January 31, 2020, noted market critic and short-sellers, Muddy Waters, announced that it had initiated a short position (ie. bet against the shares of the Company by selling them at current prices) and published an anonymous report (the "Anonymous Report")

---

[10] These Notes were purportedly offered and sold only to qualified institutional buyers pursuant to Rule 144A and to non-U.S. persons outside the United States in reliance on Regulation S under the Securities Act of 1933. Accordingly, these Notes, the ADSs deliverable upon conversion of the Notes and the Class A ordinary shares represented thereby have not been and

that it had acquired. The Anonymous Report was titled, Luckin Coffee: Fraud + Fundamentally

Broken Business, and contained the following Executive Summary:

Executive Summary

When Luckin Coffee (NASDAQ: LK) ("Luckin" or the "Company") went public in May 2019, it was a fundamentally broken business that was attempting to instill the culture of drinking coffee into Chinese consumers through cut-throat discounts and free giveaway coffee. Right after its USD 645 million IPO, the Company had evolved into a fraud by fabricating financial and operating numbers starting in 3rd quarter 2019. It delivered a set of results that showcased a dramatic business inflection point and sent its stock price up over 160% in a little over 2 months. Not surprisingly, it wasted no time to successfully raise another USD 1.1 billion (including secondary placement) in January 2020. Luckin knows exactly what investors are looking for, how to position itself as a growth stock with a fantastic story, and what key metrics to manipulate to maximize investor confidence. This report consists of two parts: the fraud and the fundamentally broken business, where we separately demonstrate how Luckin faked its numbers and why its business model is inherently flawed.

123.     The Anonymous Report was then broken up into a Part One analysis which

analyzed what it called "Smoking Gun" evidence of Fraud, in part, as follows:

**Part One: The Fraud**

Smoking Gun Evidence #1: Number of items per store per day was inflated by at least 69% in 2019 3Q and 88% in 2019 4Q, supported by 11,260 hours of store traffic video. We mobilized 92 full-time and 1,418 part-time staff on the ground to run surveillance and record store traffic for 981 store-days covering 100% of the operating hours. Store selection was based on distribution by city and location type, the same as Luckin's total directly-operated store portfolio.

Smoking Gun Evidence #2: Luckin's "Items per order" has declined from 1.38 in 2019 2Q to 1.14 in 2019 4Q.

Smoking Gun Evidence #3: We gathered 25,843 customer receipts and found that Luckin inflated its net selling price per item by at least RMB 1.23 or 12.3% to artificially sustain the business model. In the real case, the store level loss is high at 24.7%-28%. Excluding free products, actual selling price was 46% of listed price, instead of 55% claimed by management.

will not be registered under the Securities Act, and may not be offered or sold in the U.S. absent registration or an applicable exemption therefrom.

Smoking Gun Evidence #4: Third party media tracking showed that Luckin overstated its 2019 3Q advertising expenses by over 150%, especially its spending on Focus Media. It's possible that Luckin recycled its overstated advertising expense back to inflate revenue and store-level profit.

Smoking Gun Evidence #5: Luckin's revenue contribution from "other products" was only about 6% in 2019 3Q, representing nearly 400% inflation, as shown by 25,843 customer receipts and its reported VAT numbers.

124.    Part One of the Anonymous Report analyzing the fraud that existed within Luckin

also listed Red Flags that were further indicia of fraud, including the following:

Red Flag #1: Luckin's management has cashed out on 49% of their stock holdings (or 24% of total shares outstanding) through stock pledges, exposing investors to the risk of margin call induced price plunges.

Red Flag #2: CAR Inc (HKEX: 699 HK) ("CAR") déjà vu: Luckin's Chairman Charles Zhengyao Lu and the same group of closely-connected private equity investors walked away with USD 1.6 billion from CAR while minority shareholders took heavy losses.

Red Flag #3: Through acquisition of Borgward, Luckin's Chairman Charles Zhengyao Lu transferred RMB 137 million from UCAR (838006 CH) to his related party, Baiyin Wang. UCAR, Borgward, and Baiyin Wang are on the hook to pay BAIC-Foton Motors RMB 5.95 billion over the next 12 months. Now Baiyin Wang owns a recently founded coffee machine vendor located next door to Luckin's Headquarter.

Red Flag #4: Luckin recently raised USD 865 million through a follow-on offering and a convertible bond offering to develop its "unmanned retail" strategy, which is more likely a convenient way for management to siphon large amount of cash from the company.

Red Flag #5: Luckin's independent board member, Sean Shao, is/was on the board of some very questionable Chinese companies listed in the US that have incurred significant losses on their public investors.

Red Flag #6: Luckin's co-founder & Chief Marketing Officer, Fei Yang, was once sentenced to 18 months' imprisonment for crime of illegal business operations when he was the co-founder and general manager of Beijing Koubei Interactive Marketing & Planning Co.,Ltd. ("iWOM"). Afterwards, iWOM became a related party with Beijing QWOM Technology Co., Ltd. ("QWOM"), which is now an affiliate of CAR and is doing related party transactions with Luckin.

125.    Part Two of the Anonymous Report focused on what it called, Luckin's "Fundamentally Broken Business," and identified the following "Flaws" in the Company's Business Model, in part, as follows:

**Part Two: The Fundamentally Broken Business**

Business Model Flaw #1: Luckin's proposition to target core functional coffee demand is wrong: China's caffeine intake level of 86mg/day per capita is comparable to other Asian countries already, with 95% of the intake from tea. The market of core functional coffee product in China is small and moderately growing in China.

Business Model Flaw #2: Luckin's customers are highly price sensitive and retention is driven by generous price promotion; Luckin's attempt to decrease discount level (i.e. raise effective price) and increase same store sales at the same time is mission impossible.

Business Model Flaw #3: Flawed unit economics that has no chance to see profit: Luckin's broken business model is bound to collapse.

Business Model Flaw #4: Luckin's dream "to be part of everyone's everyday life, starting with coffee" is unlikely to come true, as it lacks core competence in non-coffee products as well. Its "platform" is full of opportunist customers without brand loyalty. Its labor-light store model is only suitable for making "Generation 1.0" tea drinks that have been in the market for more than a decade, while leading fresh tea players have pioneered "Generation 3.0" products five years ago.

Business Model Flaw #5: The franchise business of Luckin Tea is subject to high compliance risk as it's not registered with relevant authority as required by law, because Luckin Tea launched its franchise business in September 2019 without having at least two directly-operated stores fully operational for at least 1 year.

126.    Muddy Waters published the Anonymous Report on Friday January 31, and by Monday, February 3, 2020, Luckin had composed a complete response and denial that rebutted all of the charges made therein. Accordingly, February 3, 2020, Luckin published a release that stated, in part, the following:

**Luckin Coffee Responds to Anonymous Report Containing Misleading and False Allegations**

BEIJING, Feb. 03, 2020 (GLOBE NEWSWIRE) -- Luckin Coffee Inc. ("Luckin Coffee" or the "Company") (NASDAQ: LK), a pioneer of a technology-driven new retail model to provide coffee and other products of high quality, high affordability, and high convenience to customers, today issued the following responses to misleading and false allegations contained in an anonymous report (the "Report"), which was made public on January 31, 2020 by a short seller who may benefit from this meritless Report.

Luckin Coffee categorically denies all allegations in the Report. The methodology of the Report is flawed, the evidence is unsubstantiated, and the allegations are unsupported speculations and malicious interpretations of events. The Report also attacks members of Luckin Coffee's management team, shareholders, and business partners and its claims are either false, misleading or entirely irrelevant. Furthermore, Luckin Coffee believes that the Report demonstrates a fundamental misunderstanding of the Company's business model and operating environment. Luckin Coffee intends to take appropriate actions to defend itself against these malicious allegations and to protect the interests of its shareholders.

In particular, Luckin Coffee responded to the following misleading and false allegations raised in the Report in the following:

- The Report alleged the number of items per store per day was inflated in 2019 3Q and 4Q. There are material inconsistencies between the unsubstantiated data presented in the Report and the actual data from the Company's own system. Every single order that customers placed with Luckin Coffee is online and automatically recorded in its system, and payments for orders went through third-party payment service providers. Therefore, all the Company's key operating data, including the number of items per store per day, items per order and effective selling price, are tracked in real time and can be verified. Luckin Coffee has a robust internal control system over data management to ensure the data integrity and consistency within its system as well as that of its third party partners.

- The Report alleged items per order had declined from 2019 2Q to 2019 4Q and the effective selling price was inflated in 2019 3Q. The sources and authenticity of the alleged customer order receipts in the Report are unsubstantiated and the underlying methodology in the Report is ungrounded. Luckin Coffee's items per order during the period is substantially higher than the data alleged in the Report. In addition, Luckin Coffee stands by its reported effective selling price, which is true, accurate, and can be verified by Luckin Coffee's internal system.

- The Report alleged Luckin Coffee overstated advertising expenses and may recycle overstated advertising expenses to inflate revenue in 2019 3Q. The allegation is based on flawed assumptions, and inaccurate and misleading analysis of the Company's advertising expenses. Luckin Coffee performs a detailed review and cross check of its sales and marketing expenses with underlying evidence and confirms the Company's reported advertising expenses are true and accurate.

- The Report alleged net revenues from other products were inflated in 2019 3Q. The Report's reference to value-added-tax ("VAT") in calculating net revenues from other products represents a clear misunderstanding of the applicable VAT rates for the Company's non-freshly brewed products and the Report reached an ungrounded allegation based on such flawed and unsupported assumption. All the Company's orders are tracked in real time and the Company has rigorous internal controls over revenue recognition and reconciliation. Luckin Coffee is in strict compliance with these rigorous controls and is committed to ensure the integrity of its financial reporting.

As a data-driven company, Luckin Coffee is committed to providing full and accurate disclosure to investors and to rebutting any false claims that attempt to undermine confidence in Luckin Coffee's business, management and results of operations.

Luckin Coffee firmly stands by its business model and is confident in benefiting from the strong growth of China's coffee market in the future. Luckin Coffee's pioneering business model has enabled the Company to become the leading and fastest growing player driving coffee consumption in China. Supported by its disruptive new retail model, diversified product portfolio and strong financial position, Luckin Coffee will continue to grow its business, provide a superior customer proposition and deliver sustainable value for its shareholders over the long-term.

127.     The denials of the Anonymous Report published by Muddy Waters, contained in

Luckin's February 3, 2020 Release were each materially false and misleading when made and

were known by Defendants to be materially false and misleading at that time or were recklessly

disregarded as such thereby, for the reasons stated herein in ¶¶98-99, *supra*.

128.     Despite their undisclosed falsity, the Company's denials were almost completely

effective and apart from the small decline in the price of Luckin ADS on January 30, 2020,

shares immediately rebounded and continued to trade higher in the days and weeks ahead, evidenced by the chart below:



129.    An examination of the headline news stories focused on Luckin at the end of March and beginning of April 2020 further evidence the effectiveness of the Company's denial of the Anonymous Report, as evidenced by the following:

[InvestorPlace.com 4/1/20]
**Luckin Coffee Emerges as a Bet on China's Economic Resurgence**

[Editor's note: This story was written prior to the news that Luckin Coffee allegedly fabricated its sales. Given these allegations, all investors should approach this stock with great caution.]Luckin Coffee (NASDAQ:LK) is the fastest-growing name in coffee in China….

[NewsMarketWatch 4/1/20]
**Audacious Chinese coffee chain Luckin, not content with its quixotic battle against Starbucks, dreams of becoming Amazon, too**

Audacious Chinese coffee chain Luckin, not content with its quixotic battle against Starbucks, dreams of becoming Amazon, too

The audacious Nasdaq-listed upstart came out of nowhere in 2017 and has used technology and breakneck expansion to remake the country's coffee market

[InvestorPlace 3/25/20]
**Luckin Coffee Stock Should Be On Long-Term Investors Watchlist**

Many know China as a nation of tea-drinkers. But coffee consumption has begun to take off in the country, and so quite a number of investors have taken an interest in shares of Luckin Coffee (NASDAQ:LK).Source: Keitma / Shutterstock.com On its first day of trading in May 2019, LK stock opened at $25. The share price hit an all-time high of $50.38 in mid-January….

Bottom Line on LK Stock? I regard Luckin Coffee, often referred to as the "Starbucks of China," as a promising company for investors looking to capitalize on China's growing number of coffee drinkers….

130.    In fact, so effective were Defendants denial of the Anonymous Report that, on

March 23, 2020, Insider Monkey reported that even sophisticated investors such as hedge funds,

had never been this bullish on Luckin ADS, wroting the following:

In these volatile markets we scrutinize hedge fund filings to get a reading on which direction each stock might be going. Out of thousands of stocks that are currently traded on the market, it is difficult to identify those that will really generate strong returns. Hedge funds and institutional investors spend millions of dollars on analysts with MBAs and PhDs, who are industry experts and well connected to other industry and media insiders on top of that. Individual investors can piggyback the hedge funds employing these talents and can benefit from their vast resources and knowledge in that way. We analyze quarterly 13F filings of nearly 835 hedge funds and, by looking at the smart money sentiment that surrounds a stock, we can determine whether it has the potential to beat the market over the long-term. Therefore, let's take a closer look at what smart money thinks about Luckin Coffee Inc. (NASDAQ:LK).

**Luckin Coffee Inc. (NASDAQ:LK) investors should be aware of an increase in hedge fund interest recently.**

According to publicly available hedge fund and institutional investor holdings data compiled by Insider Monkey, Lone Pine Capital has the number one position in Luckin Coffee Inc. (NASDAQ:LK), worth close to $238.8 million, comprising 1.3% of its total 13F portfolio. The second most bullish fund manager is Alkeon Capital Management, led by Panayotis Takis Sparaggis, holding a $157.6 million position; the fund has 0.6% of its 13F portfolio invested in the stock. Other professional money managers that are bullish consist of Gabriel Plotkin's Melvin Capital Management, Anand Desai's Darsana Capital Partners and Daniel Patrick

Gibson's Sylebra Capital Management. In terms of the portfolio weights assigned to each position Keywise Capital Management allocated the biggest weight to Luckin Coffee Inc. (NASDAQ:LK), around 16.22% of its 13F portfolio. North Peak Capital is also relatively very bullish on the stock, dishing out 8.6 percent of its 13F equity portfolio to LK.

As industrywide interest jumped, key money managers have been driving this bullishness. Lone Pine Capital, initiated the largest position in Luckin Coffee Inc. (NASDAQ:LK). Lone Pine Capital had $238.8 million invested in the company at the end of the quarter. Daniel Patrick Gibson's Sylebra Capital Management also made a $56.1 million investment in the stock during the quarter. The following funds were also among the new LK investors: Fang Zheng's Keywise Capital Management, Alok Agrawal's Bloom Tree Partners, and John Armitage's Egerton Capital Limited.

### THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF LUCKIN IS BELATEDLY DISCLOSED

131.    On March 27, 2020, Luckin announced the appointment of two purported Independent Directors, including Tianruo Pu and Wai Yuen Chong, as members of the Audit Committee, effective March 27, 2020. According to the Company's release, the Securities Exchange Act of 1934 required that the Audit Committee consisted of only independent directors after one year from the date of effectiveness of the Registration Statement for the Company's IPO, and Defendant Erhai Liu had stepped down as a member of the Audit Committee; the current Audit Committee then consisted of Defendants Shao and Meier and then would also include Tianruo Pu and Wai Yuen Chong, with Defendant Shao serving as Chairman.

132.    Within days of the appointment of the new Independent Directors and upon their appointment to the Audit Committee, on April 2, 2020, Luckin shocked the market after it published a release announcing the termination of the Company's Chief Operating Officer, Defendant J. Liu, and the formation of an Independent Special Committee, and provided certain information related to a then disclosed ongoing internal investigation. This release stated, in part, the following:

BEIJING, China, April 02, 2020 (GLOBE NEWSWIRE) -- Luckin Coffee Inc. ("Luckin Coffee" or the "Company") (NASDAQ: LK) today announced that the Company's Board of Directors (the "Board") has formed a special committee (the "Special Committee") to oversee an internal investigation into certain issues raised to the Board's attention during the audit of the consolidated financial statements for the fiscal year ended December 31, 2019 (the "Internal Investigation").

The Special Committee is comprised of three independent directors of the Board, Mr. Sean Shao, Mr. Tianruo Pu and Mr. Wai Yuen Chong, with Mr. Shao serving as its chairman. The Special Committee has retained independent advisors, including independent legal advisors and forensic accountants, in connection with the Internal Investigation. The Special Committee has retained Kirkland & Ellis as its independent outside counsel. Kirkland & Ellis is assisted by FTI Consulting as an independent forensic accounting expert. The Internal Investigation is at a preliminary stage.

133.    The April 2, 2020 Release further stated, in part, the following:

The Special Committee today brought to the attention of the Board information indicating that, beginning in the second quarter of 2019, Mr. Jian Liu, the chief operating officer and a director of the Company, and several employees reporting to him, had engaged in certain misconduct, including fabricating certain transactions. The Special Committee recommended certain interim remedial measures, including the suspension of Mr. Jian Liu and such employees implicated in the misconduct and the suspension and termination of contracts and dealings with the parties involved in the identified fabricated transactions. The Board accepted the Special Committee's recommendations and implemented them with respect to the currently identified individuals and parties involved in the fabricated transactions. The Company will take all appropriate actions, including legal actions, against the individuals responsible for the misconduct.

The information identified at this preliminary stage of the Internal Investigation indicates that the aggregate sales amount associated with the fabricated transactions from the second quarter of 2019 to the fourth quarter of 2019 amount to around RMB2.2 billion [US$310 million]. Certain costs and expenses were also substantially inflated by fabricated transactions during this period. The above figure has not been independently verified by the Special Committee, its advisors or the Company's independent auditor, and is subject to change as the Internal Investigation proceeds. The Company is assessing the overall financial impact of the misconduct on its financial statements. As a result, investors should no longer rely upon the Company's previous financial statements and earning releases for the nine months ended September 30, 2019 and the two quarters starting April 1, 2019 and ended September 30, 2019, including the prior guidance on net revenues from products for the fourth quarter of 2019, and other communications relating to these consolidated financial statements. The investigation is ongoing and the

Company will continue to assess its previously published financials and other potential adjustments.

Luckin Coffee will release additional information concerning the Internal Investigation in due course and is committed to taking appropriate measures to improve its internal controls.

134. Following the shocking belated disclosure by the Company, Luckin's ADS shares collapsed – falling over 80% in intra-day trading and wiping out billions of dollars of market capitalization, on the Nasdaq on April 2, 2020. The chart below evidences the complete destruction of the price of Luckin ADS caused as a result of Defendants' belated disclosure:



135. The following day, April 3, 2020, *Reuters* reported that the China Securities Regulatory Commission (CSRC) stated that it would investigate Luckin. *Reuters* reported that, China's securities regulator said on Friday it would investigate claims of fraud at Luckin, and further reported that sources also said some of the banks involved in the Company's IPO were reviewing their work in connection with the listing; reporting that both CICC and Morgan Stanley had begun internal investigations into the due diligence they conducted for the IPO to determine how the Company's annual sales for 2019 could have been inflated by as much as 40% (US$310 million). *Reuters* further reported that ADS shares of Luckin sank as much as 81% on Thursday in New York after it announced an internal investigation that had shown its Chief Operating Officer and other employees fabricated sales deals. Also according to *Reuters*, the

CSRC said on Friday that, "Regardless of the listing location, listed companies should strictly abide by laws and regulations in relevant markets, and fulfil obligations to make truthful, accurate and complete disclosures."

136.    Thus, the fraud alleged by Muddy Waters and the Anonymous Report at the end of January 2020 that charged that Luckin was "fabricating financial and operating numbers" since the 3Q:19 was partly correct. Luckin's internal investigation, however, revealed that the fabrication stretched back further, to 2Q:19 (and possibly further). The Anonymous Report had clearly charged that Luckin was inflating the number of items sold per day by at least 69% in 3Q:19 and 88% in 4Q:19. Based that on over 11,000 hours of store traffic video and the examination of 26,000 customer receipts, the Anonymous Report also claimed that the Company inflated its net selling price by at least 12.3%; that store losses amounted to 24.7% to 28%; and that, excluding the products that were given away free, actual selling price was 46% of the listed price instead of 55% as claimed.

137.    On Monday, April 6, 2020, just after the market opened, Goldman Sachs & Co. LLC ("Goldman Sachs") issued a notice revealing the final piece of Defendants' fraud. In the notice, Goldman Sachs stated the following:

> NEW YORK--(BUSINESS WIRE)--Following the occurrence of a default by Haode Investment Inc. (the "Borrower"), a shareholder of Luckin Coffee Inc. (the "Company") (NASDAQ: LK), under a US$ 518 million margin loan facility (the "Facility"), a syndicate of lenders, as secured parties under the Facility (the "Lenders"), has instructed Credit Suisse AG, Singapore Branch as security trustee, to exercise the Lenders' rights with respect to the collateral securing the Borrower's repayment obligations under the Facility. A total of 515,355,752 Class B ordinary shares and 95,445,000 Class A ordinary shares of the Company have been pledged to secure the Facility, including shares additionally pledged by an entity controlled by the family trust of Ms. Jenny Zhiya Qian, the Company's CEO.
>
> The Borrower is controlled by the family trust of Mr. Charles Zhengyao Lu, the Chairman of the Company's Board of Directors. The Facility is full recourse to Mr. Lu and his spouse.

In connection with the exercise of their rights under the Facility, the Lenders have commenced the process of enforcement against the collateral in order to satisfy the Borrower's obligations under the Facility, including the conversion of Class B ordinary shares of the Company into American Depositary Shares ("ADSs") of the Company. There are no applicable lock-up restrictions in respect of the Class A ordinary shares or the ADSs of the Company (collectively, the "Securities"). Assuming that all Securities pledged under the Facility were sold, Mr. Lu's voting interest in the Company would not decrease, but Ms. Qian's beneficial and voting interests would decrease significantly.

The Securities are freely transferable under the federal securities laws, and no registration of the Securities under the federal securities laws is required for the offer or sale of the Securities. The lenders, acting through a disposal agent, expect to effect sales of the Securities in one or more public market and/or private transactions, depending on market conditions. No assurance can be given how many sales will occur and no disposal agent will have a commitment to purchase any Securities. Various affiliates of the lenders might be the purchaser(s) of the Securities. No prospectus or other offering document will be used in connection with any sale of the Securities and neither the Company nor Mr. Lu will be involved with, or otherwise participate in, any such sale; sales will be made by the disposal agent solely on the basis of public information.

138.    Put more simply, Goldman Sachs explained that an entity controlled by Defendant Lu defaulted on a $518 million margin loan facility and a group of lenders was putting 76.3 million of the Company's ADS—pledged as collateral for the loan by Defendants Lu and Zhiya—up for sale, with Goldman Sachs acting as the "disposal agent." In other words, while the Company's shares were artificially inflated by and through Defendants' misrepresentations, Defendants Lu and Zhiya cashed out over 76 million shares to act as collateral for *personal* loans.

139.    Upon the revelation of these previously undisclosed facts, the value of Luckin's ADS shares declined over 18%, to fall to their lowest-ever price of $4.39 per share at close on April 6, 2013.

## CAUSATION AND ECONOMIC LOSS

140.    Defendants' publication of materially false and misleading statements at the beginning of the Class Period allowed Defendants to sell over $645 million of ADS shares to the

public in the May 2019 IPO, an additional US$666.54 million ADS in the Secondary Offering, plus US$460 million in Senior Convertible Notes sold concurrently with the Secondary Offering, and also allowed the Selling Shareholders to sell over $231 million of their personally held Luckin shares and, thereafter, during the remainder of the Class Period it also had the intended effect of causing Luckin's shares to trade at artificially inflated levels. As a result of Defendants' publication of these false statements, during the Class Period shares of the Company traded to a high of over $50.00 per share soon after the Secondary Offering in mid-January 2020.

141.    Contrary to the positive statements made by Defendants during the Class Period, however, on April 2, 2020, Defendants revealed that the Company would come nowhere-near achieving guidance previously sponsored and/or endorsed by Defendants, and that Luckin would be forced to take large charges to account for its impaired assets and fraudulent accounting. That day, Defendants reported that the Company had overstated its net earnings by over $310 million during 2019, which accounted for approximately 40%. At that time, Defendants also retracted and revised full year estimates much lower than previous guidance. Furthermore, on April 6, 2020, Goldman Sachs revealed that Defendants Lu and Zhiya had cashed out a large percentage of their Luckin ADS holdings at vastly artificially inflated values to use as collateral for a $518 million loan now in default. These belated disclosures had an immediate, adverse impact on the price of Luckin ADS shares.

142.    The decline in Luckin's share price at the end of the Class Period was a direct result of the nature and extend of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of Luckin's ADS share price decline negates any inference that the losses suffered by Plaintiffs and the other members of the Class was caused by changed

market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' fraudulent conduct.

143.    During the same period in which Luckin's share price fell as much as 75% as a result of Defendants' illegal and improper course of conduct and their fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged. The economic loss, *i.e.* damages suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Luckin's ADS shares and the subsequent significant decline in the value of the Company's shares when Defendants' prior misstatements and other fraudulent conduct was revealed, as evidenced by the Chart below:



## ADDITIONAL SCIENTER ALLEGATIONS

144.    As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Luckin, their control over, and/or receipt and/or modification of Luckin's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Luckin, participated in the fraudulent scheme alleged herein.

145.    Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because, the scheme: (i) deceived the investing public regarding Luckin's business, operations, management and the intrinsic value of Luckin ADS shares; (ii) enabled Defendants to register for sale with the SEC, over US$645.15 million of Company ADS in connection with the Initial Public Offering; (iii) enabled Defendants to register for sale with the SEC, an additional US$666.54 million of Company ADS in connection with the Secondary Offering; (iv) enabled Defendants to also sell US$460 million in Senior Convertible Notes (convertible into shares of the Company at $52.00); (v) enabled Luckin insiders to sell US$231.84 million of their privately held Luckin shares while in possession of material adverse non-public information about the Company; and (v) caused Plaintiffs and other members of the Class to purchase Luckin ADS shares at artificially inflated prices.

146.    In connection with the Secondary Offering, Defendant Li was able to sell over 5.52 million ADS shares he owned and/or controlled to realize illicit gross proceeds of over $231.8 million, while in possession of material adverse non-public information about Luckin.

147.    On April 4, 2020—just two days after Luckin shocked the market when it disclosed an internal investigation found hundreds of millions of dollars of fabricated transactions, Defendant Lu apologized and pledged to strengthen the Company's controls.

148.    Specifically, Defendant Lu said on social media that he was "ashamed" and "accepted all questions and criticisms." He further stated: "I personally blame myself. Regardless of the final findings of the independent committee, I will bear the responsibly that I ought to."

149.    This admission of wrongdoing at the Company by Defendant Lu further supports Plaintiffs' allegations of Defendants' scienter and falsity during the Class Period.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

150.    At all relevant times, the market for Luckin's ADS shares was an efficient market for the following reasons, among others:

(a)    Luckin's shares met the requirements for listing, and was listed and actively traded on the Nasdaq national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Luckin filed periodic public reports with the SEC and the Nasdaq;

(c)    Luckin regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and

    (d)  Luckin was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

  151. As a result of the foregoing, the market for Luckin securities promptly digested current information regarding Luckin from all publicly available sources and reflected such information in Luckin share price. Under these circumstances, all purchasers of Luckin ADS shares during the Class Period suffered similar injury through their purchase of Luckin shares at artificially inflated prices and a presumption of reliance applies.

<div align="center"><b><u>NO SAFE HARBOR</u></b></div>

  152. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

<div align="center">85</div>

and/or approved by an executive officer of Luckin who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

153.   Plaintiffs have alleged the following based upon the investigation of Plaintiffs' counsel, which included a review of SEC filings by Luckin, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM
### COUNT I
### (Against All Defendants)
### For Violation of Section 11 of the Securities Act

154.   Plaintiffs incorporate by reference each and every allegation contained above, as if set forth herein only to the extent, however, that such allegations do ***not*** allege fraud, scienter or the intent of the Defendants to defraud Plaintiffs or members of the Class. This count is predicated upon Defendants strict liability for making false and materially misleading statements in the Registration Statement and Prospectus. This Count is asserted by Plaintiffs against all Defendants by and on behalf of persons who acquired ADS shares of the Company pursuant to the false Registration Statement and Prospectus issued in connection with the May 2019 Initial Public Offering and in connection with the January 2020 Secondary Offering, as specified herein *supra*.

155.    Luckin is the issuer of the ADS shares issued via the false Registration Statement and Prospectus. As such, Luckin is strictly liable for each false and misleading statement contained therein.

156.    The Defendants identified in paragraphs ¶¶21-30, 32-37, *supra.*, are each signatories of the Registration Statement or Underwriters of the May 2019 IPO and/or January 2020 Secondary Offering, therefore, each of these Defendants had a duty to make a reasonable investigation of the statements contained in the Registration Statement and Prospectus to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, Defendants should have known of the material misstatements and omissions contained in the Registration Statement and Prospectus and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As such, each of these Defendants are liable to Plaintiffs and the Class.

157.    Each of the Defendants identified in Count I issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statement and Prospectus with misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated § 11 of the Securities Act. As a direct and proximate result of Defendants' wrongful conduct, the price for the Luckin ADS shares sold in the 2019 IPO and 2020 Secondary Offering was artificially inflated and Plaintiffs and the Class suffered substantial damages in connection with their purchase of Luckin ADS shares.

158.    Plaintiffs and other members of the Class acquired their Luckin ADS shares without knowledge of the untruths and/or omissions alleged herein. Plaintiffs and the other members of the Class were thus damaged by Defendants' misconduct and by the material misstatements and omissions of the aforementioned Registration Statements and Prospectuses.

159.    This action was brought within one year after the discovery of the untrue statements and omissions and within three years after the May 2019 IPO and January 2020 Secondary Offering of Luckin ADS and the Concurrent Note Offering of convertible Notes.

## COUNT II

### (Against The Individual Defendants)
### For Violation of Section 15 of the Securities Act

160.    Plaintiffs incorporate by reference each and every allegation contained above as if set forth herein. This Count is asserted against the Individual Defendants.

161.    Throughout the Class Period, the Individual Defendants acted as controlling persons of Luckin within the meaning of §15 of the Securities Act. By reason of their share ownership, senior management positions and/or directorships at the Company, as alleged above, these Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Luckin to engage in the unlawful acts and conduct complained of herein.

162.    By reason of such conduct, the Defendants named in this Count are liable pursuant to §15 of the Securities Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and the Class suffered damages in connection with their acquisition of Luckin ADS shares.

## COUNT III

**(Against All Defendants)**
**Violation of Section 12(a)(2) of the Securities Act**

163.     Plaintiffs repeat and reallege each and every allegation contained above.

164.     This Count is brought by Plaintiffs pursuant to Section 12(a)(2) of the Securities Act on behalf of all purchasers of Luckin shares in connection with and traceable to the May 2020 Initial Public Offering and also in connection with the January 2020 Secondary Offering. This cause of action is brought against all Defendants.

165.     Defendants were sellers, offerors, underwriters and/or solicitors of sales of the Luckin ADS shares offered pursuant to the 2019 IPO and 2020 Secondary Offering Registration Statements and Prospectuses.

166.     The Luckin Initial Public Offering and its Secondary Offering Registration Statements and Prospectuses each contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectuses and Registration Statements.

167.     The Defendants owed to the purchasers of Luckin shares which were sold in the 2019 IPO and 2020 Secondary Offering the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus and Registration Statement, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering materials as set forth above.

168.    Plaintiffs and other members of the Class purchased or otherwise acquired Luckin shares pursuant to and/or traceable to the defective Registration Statements and Prospectuses. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses and Registration Statements.

169.    Plaintiffs, individually and representatively, hereby offer to tender to Defendants those securities which Plaintiffs and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

170.    By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act. Accordingly, Plaintiffs and members of the Class who hold Luckin ADS shares purchased in the May 2019 IPO or the January 2020 Secondary Offering have the right to rescind and recover the consideration paid for their Luckin shares and, hereby elect to rescind and tender their Luckin shares to the Defendants sued herein. Plaintiffs and Class members who have sold their Luckin ADS shares are entitled to rescissory damages.

171.    Less than three years elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

## COUNT IV

**(Against the Individual Defendants)**
**Violation Of Section 10(b) Of The Exchange Act**
**And Rule 10b-5 Promulgated Thereunder**

172.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

173.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Luckin's business, operations, management and the intrinsic value of Luckin ADS shares; (ii) enable Defendants to register for sale with the SEC, over US$645.15 million of Company ADS in connection with the Initial Public Offering; (iii) enable Defendants to register for sale with the SEC, an additional US$666.54 million of Company ADS in connection with the Secondary Offering; (iv) enable Defendants to also sell US$460 million in Senior Convertible Notes (convertible into shares of the Company at $52.00); (v) enable Luckin insiders to sell US$231.84 million of their privately held Luckin shares while in possession of material adverse non-public information about the Company; and (v) cause Plaintiffs and other members of the Class to purchase Luckin ADS shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

174.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADS shares in an effort to maintain artificially high market prices for Luckin's ADS shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

175.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Luckin as specified herein.

176.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Luckin's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Luckin and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Luckin ADS shares during the Class Period.

177.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these

Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

178.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or with reckless disregard for the purpose and effect of concealing Luckin's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its ADS shares. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

179.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Luckin ADS shares was artificially inflated during the Class Period. In ignorance of the fact that market prices of Luckin's publicly-traded ADS shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Luckin ADS shares during the Class Period at artificially high prices and were damaged thereby.

180.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Luckin was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Luckin ADS shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

181.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

182.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADS shares during the Class Period.

## COUNT V

**(Against the Individual Defendants)**
**Violation Of Section 20(a) Of The Exchange Act**

183.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

184.    The Individual Defendants acted as controlling persons of Luckin within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

185.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

186.    As set forth above, Luckin and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's ADS shares during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


DATED:        April 8, 2020                  Respectfully submitted,

                                             **KAHN SWICK & FOTI, LLC**

                                             */s/ Kim E. Miller*
                                             Kim E. Miller
                                             250 Park Avenue, Suite 2040
                                             New York, NY 10177
                                             Telephone: (212) 696-3730
                                             Fax: (504) 455-1498

                                             -and-

                                             Lewis S. Kahn
                                             1100 Poydras Street, Suite 3200
                                             New Orleans, LA 70163
                                             Telephone: (504) 455-1400
                                             Fax: (504) 455-1498

                                             *Counsel for Plaintiffs Vijaya Gopu and Nirmala Gopu*